**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 26 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MICHAEL PAUL DALE SINCLAIR,

      Defendant-Appellant.

No. 96-5040

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. CR-95-60-2)

Neal B. Kirkpatrick, Assistant United States Attorney (Steven C. Lewis, United States Attorney with him on the brief), Office of U.S. Attorney, Tulsa, Oklahoma, for Plaintiff-Appellee.

Keith A. Ward, Tilly & Ward, Tulsa, Oklahoma, for Defendant-Appellant.

Before EBEL, HENRY, and BRISCOE, Circuit Judges.

HENRY, Circuit Judge.

Michael Paul Dale Sinclair was convicted after a jury trial of knowingly making a false declaration before the court in violation of 18 U.S.C. § 1623 and of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371. He argues that the district court: (1) erred in denying his motion for a new trial on the basis of newly discovered evidence; (2) made inadequate findings before admitting out-of-court statements of his alleged coconspirators; (3) erred in admitting the testimony of witnesses who lacked personal knowledge; (4) improperly limited cross-examination as to possible inducements for a witness's testimony; (5) erred in failing to require the government to disclose the identity of a confidential informant; and, finally, (6) erred in imposing a three-level upward adjustment in his offense level for interference with the administration of justice pursuant to United States Sentencing Guidelines § 2J1.3(b)(2). We affirm Mr. Sinclair's conviction and sentence.

## BACKGROUND

Mr. Sinclair's convictions arise out of his testimony at the March 1995 criminal trial of his acquaintances, Peter McMahon and Kandy Thomas, in the United States District Court for the Northern District of Oklahoma. After police officers seized a shotgun from Mr. McMahon's and Ms. Thomas's Tulsa, Oklahoma apartment during the execution of a search warrant on September 9, 1994, Mr. McMahon and Ms. Thomas were charged with possession of a firearm after former conviction of a felony and possession of a firearm in connection with drug trafficking.

2

At the McMahon/Thomas trial, Mr. Sinclair testified that on the morning of September 9, 1994, he observed Ms. Thomas's son, Dallas Woods, return to the apartment with his father, Ron Woods. Mr. Sinclair stated that he saw Ron Woods carry a box containing a shotgun into the apartment.

Following Mr. Sinclair, Dallas Woods testified that his father had indeed delivered the shotgun to the McMahon/Thomas apartment on September 9, 1994. However, after prosecutors spoke with the Woods family during a recess, Dallas recanted his testimony, stating that the shotgun belonged to Mr. McMahon and that it had been in Mr. McMahon's and Ms. Thomas's possession for several months. He then testified that Mr. McMahon and Ms. Thomas had induced him to offer false testimony.

Following Dallas Woods's testimony, Ms. Thomas entered into a plea agreement with the government. Mr. McMahon then testified that he had asked Mr. Sinclair to testify falsely regarding the delivery of the shotgun and that Mr. Sinclair agreed to do so. The jury subsequently convicted Mr. McMahon.

Following the McMahon/Thomas trial, a grand jury in the Northern District of Oklahoma charged Mr. Sinclair with conspiracy and false declaration before a court. At Mr. Sinclair's trial, the government presented several witnesses who testified about Ms. Thomas's and Mr. McMahon's possession of the shotgun. Terry Young testified that he had delivered the shotgun to Ms. Thomas and Mr. McMahon at their previous residence.

The government also called Ms. Thomas, who agreed that Mr. Young had delivered the shotgun in the summer of 1994.

The government's witnesses, particularly Mr. McMahon and Ms. Thomas, also explained how Mr. Sinclair came to testify at the McMahon/Thomas trial. Although Mr. McMahon claimed a loss of memory and was unable to answer many of the prosecutor's questions, he did acknowledge that he had previously testified at the McMahon/Thomas trial that he had asked Mr. Sinclair to testify falsely regarding the delivery of the shotgun to the apartment and that Mr. Sinclair complied. Ms. Thomas testified that she and Mr. McMahon discussed a plan to use false testimony at their trial so that they would not be convicted of illegal possession of the firearm and that, through conversations with Mr. McMahon, she became aware that Mr. McMahon had enlisted Mr. Sinclair's participation in the plan. She testified that she contacted Mr. Sinclair before the McMahon/Thomas trial and that he stated that he was "okay" with what he and Mr. McMahon had discussed. Aplt's App. at 329.

The government also presented testimony concerning the events of September 9, 1994, the date on which, according to his testimony at the McMahon/Thomas trial, Mr. Sinclair had observed Ron Woods delivering the shotgun to Ms. Thomas's and Mr. McMahon's apartment. Mr. McMahon testified that Ms. Thomas was alone in the apartment on that morning. Ms. Thomas stated that Dallas had gone to school on that

4

day, but acknowledged that she had abused the narcotic Dilaudid and the sedative Xanax during that period and that her memory was somewhat vague.

Finally, the government presented testimony from Dallas Woods. Dallas testified that the shotgun did not belong to him or his brother, that he had seen the gun before September 9, 1994, at Ms. Thomas's and Mr. McMahon's current and former apartments, that his father did not visit the McMahon/Thomas apartment on September 9th, that he had gone to school on September 9th, and that Ms. Thomas and Mr. McMahon had procured his false testimony.

In closing arguments, the government referred to Dallas Woods's school attendance, stating:

> [T]he testimony is undisputed that Dallas Woods was at school on the morning of September 9th. That testimony is unrefuted. In this very document, in this transcript [Mr. Sinclair] said under oath, in addition to the other things we say he said which were a lie, he said he had a conversation with Dallas and his father, somebody he took to be his father. He couldn't have done that. It's impossible because Dallas was at school. He trapped himself with his own mouth.

Aplt's App. at 412. During deliberations, the jury sent a note to the court asking if it could "find out for sure if Dallas Woods was in school." Aplt's App. at 39. The court instructed the jury to decide the case based on the evidence that had already been provided, and the jury then convicted Mr. Sinclair on both of the charges.

After the trial, Mr. Sinclair's counsel requested that the government inquire whether any person involved in the prosecution of the case had information regarding

5

Dallas's absence from school on September 9, 1994. The government responded that it had not attempted to acquire the school records. However, after receiving Mr. Sinclair's request, the Assistant United States Attorney contacted the Office of the Registrar of the Tulsa Public Schools. The Registrar's Office stated that Dallas Woods may not have been in school on September 9, 1994, and the government communicated this new information to Mr. Sinclair. Thereafter, at Mr. Sinclair's request, the court issued a subpoena compelling the production of Dallas's attendance records. The records indicated that Dallas had an unexplained absence on September 9, 1994. Mr. Sinclair moved for a new trial on the basis of this newly discovered evidence, but the district court denied the motion.

**DISCUSSION**

## 1.  Newly Discovered Evidence

Mr. Sinclair first argues that the district court erred in denying his motion for a new trial on the grounds of newly discovered evidence--the records of the Tulsa Public Schools indicating that Dallas Woods had an unexplained absence on September 9, 1994. He challenges the district court's finding that Dallas' whereabouts were immaterial to the principal issues in the case, maintaining that the jury's note demonstrates the materiality of Dallas Woods's absence from school on September 9, 1994.

Rule 33 of the Federal Rules of Criminal Procedure authorizes trial courts to grant new trials "if required in the interest of justice." Fed. R. Crim. P. 33. We review the denial of a motion for a new trial for an abuse of discretion. United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1993). A motion for a new trial is not regarded with favor and should only be granted with great caution. Id. at 1518.

## A. The Probability Standard

When a motion for a new trial is based on newly discovered evidence, the defendant is usually required to show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992) (quoting United States v. Harpster, 759 F. Supp. 735, 738 (D. Kan.), aff'd, 931 F.2d 542 (10th Cir. 1991)). Applying this well-established probability standard, the district court determined that Dallas's whereabouts on September 9, 1994, were not material to the principal issues in Mr. Sinclair's perjury trial -- whether there existed a conspiracy to commit perjury between Mr. Sinclair and others, whether Mr. Sinclair lied when he testified that he observed someone carrying the firearm in question into the McMahon/Thomas apartment, whether the lie was material to the McMahon/Thomas trial, and whether he lied

knowingly and willfully. Additionally, the district court concluded that Mr. Sinclair could have discovered the school attendance records during the trial and that the evidence was merely cumulative.

For several reasons we find no abuse of discretion in the district court's ruling. First, although the evidence was discovered after trial, Mr. Sinclair could have reasonably anticipated the relevance of Dallas's whereabouts to his defense and sought to obtain the school attendance records before trial. The importance and relevance of the Dallas's whereabouts to Mr. Sinclair's defense remained a constant that did not increase simply because the jury expressed an interest in his school attendance by sending the court a note during its deliberations. Additionally, at best, the school records are merely impeaching and thus cumulative, calling into question the already doubtful credibility of the testimony of Kandy Thomas, a convicted felon, and her son, Dallas Woods, an admitted perjurer. Thus, the district court did not abuse its discretion in its application of the probability test to deny Mr. Sinclair's motion for a new trial

### B. The Possibility Standard

In the alternative, Mr. Sinclair argues that we should decline to apply the probability standard and should adopt the possibility standard first articulated by the Seventh Circuit in Larrison v. United States, 24 F.2d 82 (7th Cir. 1928). Under the Larrison possibility standard, a defendant is entitled to a new trial if:

> (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the

8

> jury *might* have reached a different conclusion. (c) That the
> party seeking the new trial was taken by surprise when the
> false testimony was given and was unable to meet it or did not
> know of its falsity until after the trial.

Larrison, 24 F.2d at 87-88 (emphasis in original). Although the Larrison court stated that the witness's false testimony must take the defendant by surprise, subsequent Seventh Circuit decisions have held that a showing of surprise is not required in every case. See United States v. Leibowitz, 919 F.2d 482, 484-485 (7th Cir. 1990). Under the more recent decisions, surprise is merely a factor evincing the falsity of the challenged testimony. Id. The possibility test focuses on the credibility of the testimony given at the previous trial rather than on the newly discovered evidence. United States v. Higgins, 412 F.2d 789, 790 (7th Cir. 1969).

Several other circuits have limited the application of the possibility test to cases in which the government knowingly, recklessly, or negligently used the perjured testimony. See, e.g., United States v. Tierney, 947 F.2d 854, 860-61 (8th Cir. 1991) ("[W]hen the court finds that the government knowingly, recklessly or negligently used the false testimony, the less stringent new trial standard applies."); United States v. Widgery, 674 F.2d 710, 712-13 (8th Cir. 1982) (concluding that the knowing use of perjured testimony requires a new trial if there is any reasonable likelihood that the testimony affected the jury's verdict). The Second and Ninth Circuits have criticized the Larrison possibility standard as requiring reversal in cases of perjury in even minor matters. See United States v. Krasny, 607 F.2d 840, 843-45 (9th Cir. 1979); United States v. Stofsky, 527 F.2d 237,

9

245-46 (2d Cir. 1975).  Additionally, the Ninth Circuit has questioned the distinction that the possibility test draws between false or recanted trial testimony and any other new evidence.  See Krasny, 607 F.2d at 844 ("The focus of the inquiry is on what difference the evidence would have made to the trial, regardless of its source.").

Although this circuit has concluded on one occasion that the moving party did not satisfy the Larrison probability standard, see United States v. Briola, 465 F.2d 1018, 1022 (10th Cir. 1972), we have never expressly adopted that test for the granting of new trials, see United States v. Jackson, 579 F.2d 553, 557 (10th Cir. 1978) (noting that the Briola court did not expressly adopt the Larrison rule).  Moreover, since Jackson, this court has applied the stricter probability standard in cases involving the post-trial discovery of perjury and the recantation of testimony.  See, e.g., Chatman, 994 F.2d at 1518 (10th Cir. 1993);  United States v. Miller, 987 F.2d 1462, 1466 (10th Cir. 1993).

We decline to apply the Larrison possibility test to this case.  Most importantly, application of the more stringent probability standard  is consistent with our more recent decisions.  See Stevens, 978 F.2d at 570; Chatman, 994 F.2d at 1518; Miller, 987 F.2d at 1466.  Moreover, we are unwilling to apply the Larrison possibility standard when, as here, the allegedly false testimony is merely impeaching.  We recognize that the possibility standard applied in Larrison and subsequent cases might be appropriate when the government has knowingly, recklessly, or negligently offered false testimony.  However, Mr. Sinclair has not alleged, nor does the record show, that the government

10

knowingly, recklessly, or negligently used Dallas Woods's testimony about his school attendance. We therefore conclude that the Larrison possibility standard should not be applied under the circumstances in this case.[1]

## 2. Coconspirator Statements

Mr. Sinclair contends that the district court erred in admitting Mr. McMahon's out-of-court statements pertaining to his plan to present false testimony at the McMahon/Thomas trial. The statements in question were offered through Kandy Thomas, who testified that she and Mr. McMahon "talked about . . . whose hands we could place the shotgun in because [Mr. McMahon] knew he was going to look at a lot of time and I would be getting a lot of time because we were both convicted felons and we couldn't have a shotgun." Aplt's App. at 325. She added that "[Mr. McMahon] told me that he was going to talk to [Mr. Sinclair] and see if [Mr. Sinclair] would do it for him, for us." Id. at 327.

---

[1] Furthermore, even if we were to apply the Larrison possibility test, the newly discovered evidence in question--the school record indicating that Dallas Woods was absent on September 9, 1994--does not necessarily establish that Dallas was present at the McMahon/Thomas apartment on that morning. It is possible that Dallas told Ms. Thomas that he was going to school but went somewhere else. Alternatively, he may have told Ms. Thomas that he was going somewhere other than school, and she may have misunderstood him. In either case, the newly discovered school record would not be inconsistent with the government's theory that Mr. Sinclair lied about the delivery of the shotgun.

11

Under Fed. R. Evid. 802, hearsay is not admissible in a trial. Rule 801(d)(2)(E) of the Federal Rules of Evidence establishes one of several exceptions to this general principle: a statement is not hearsay if it is made by "a coconspirator of a party during the course and in furtherance of the conspiracy." Thus, under Rule 801(d)(2)(E), statements of a defendant's alleged conspirators may not be admitted over objection unless the trial court finds the following elements by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy. United States v. Urena, 27 F.3d 1487, 1490 (10th Cir. 1994). Additionally, the "strongly preferred order of proof" in determining the admissibility of an alleged coconspirator's statement is to first hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence. Id. at 1491; see also United States v. James, 590 F.2d 575 (5th Cir. 1979).

Invoking Fed. R. Evid. 801(d)(2)(E), Mr. Sinclair argues that the district court erred in two respects: (1) in failing to make the necessary threshold findings regarding Mr. McMahon's out-of-court statements; and (2) in admitting the statements without sufficient evidence to support each of the required elements. We discuss each argument separately.

### A. Lack of formal findings

Rule 801(d)(2)(E) requires the trial court to make findings regarding the required elements before admitting coconspirator's out-of-court statements.  See generally Perez, 989 F.2d 1574, 1581 (10th Cir. 1993) (en banc).  "'The existence of a conspiracy and [defendant's] involvement in it are preliminary questions of fact that . . . must be resolved by the [trial] court.'"  Id. at 1582 (quoting Bourjaily v. United States, 483 U.S. 171, 175 (1987)).  "'[A]n appellate court is not the proper forum to conduct the needed factual hearing.'"  Id. (quoting United States v. Mahar, 801 F.2d 1477, 1503 (6th Cir. 1986)).  The court of appeals should not presume that the trial judge made implicit findings and then search the record on appeal for evidence that the district court might have relied upon to support the findings.  Id.  Nevertheless, we have acknowledged that a lack of formal findings may not always require a remand to the trial court.  In some cases, the record may demonstrate  "without any question that the trial court did make the requisite inquiry even though no formal findings appear."  Id. at 1582 n.3.  Additionally, "it is also possible that the evidence establishing admissibility would be without doubt sufficient, unimpeachable, and uncontroverted, so that no credibility or factual determination would be required."  Id.  In either instance,  remand for express findings on the Rule 801(d)(2)(E) elements is not required.

In the instant case, even though it did not enter formal findings as to each of the 801(d)(2)(E) elements, the district court did consider the admissibility of the out-of-court statements before the government sought to introduce them.   During a bench conference

13

on the morning of the first day of trial, Mr. Sinclair's attorney requested the court "not to solicit any coconspiratorial hearsay until the Court approves of that." Aplt's App. at 107.[2] He argued that Mr. McMahon's and Ms. Thomas's testimony would not be sufficiently credible to support the government's conspiracy charge. In response, the court said that it anticipated that the government would introduce independent evidence establishing the existence of the conspiracy before offering out-of-court statements through Ms. Thomas. Id. at 108. During the trial, the government presented the evidence that the court had anticipated: Mr. McMahon acknowledged that he had previously testified that he had asked Mr. Sinclair to offer false testimony and that Mr. Sinclair had complied.

After Mr. McMahon, the government called Ms. Thomas. Before asking her about Mr. McMahon's out-of-court statements, the prosecutor asked the district court to "make the Andrews Peterson[3] finding that sufficient evidence of the conspiracy exists so that the out-of-court statements of the coconspirators are admissible in evidence." Aplt's. App. at 324. Mr. Sinclair's attorney responded, "[T]here's no probable cause to believe anything at this point," but the court ruled that it would allow the testimony. Id.

---

[2]     Mr. Sinclair also filed a pretrial motion in limine. However, in his written motion and supporting brief, he did not raise the Rule 801(d)(2)(E) issue. See Aplt's App., doc. 2, at 17-24.

[3]     The prosecutor was referring to United States v. Andrews, 585 F.2d 961 (10th Cir. 1978) and United States v. Petersen, 611 F.2d 1313 (10th Cir. 1979). Both cases state that the district court must conduct the three-part inquiry required by Rule 801(d)(2)(E) before admitting out of court statements of alleged coconspirators. See Andrews, 585 F.2d at 965-66; Peterson, 611 F.2d at 1327-28.

In this instance, several factors establish that, when the court ruled that it would allow testimony about the out-of-court statements, it had undertaken the requisite inquiry regarding the first two Rule 801(d)(2) elements--(1) whether a conspiracy existed and (2) whether the defendant and the declarant were members of the conspiracy. First, the court's statements at the pretrial bench conference indicate that it understood that the government was required to establish the existence of the conspiracy before the out-of-court statements could be admitted. Moreover, Mr. McMahon's testimony that he had asked Mr. Sinclair to offer false testimony at the McMahon/Thomas trial and that Mr. Sinclair had complied constituted evidence of the first two Rule 801(d)(2)(E) elements (i.e., that there was a conspiracy and that both Mr. Sinclair and Mr. McMahon, the defendant and the declarant, were members of it). Thus, the issue before the court when the government requested "the Andrews Peterson finding" was whether Mr. McMahon's testimony was sufficiently credible to support the government's conspiracy allegations. The court's statement that it "was going to allow" the out-of-court statements indicates that it found Mr. McMahon's testimony sufficiently credible to establish the first two Rule 801(d)(2)(E) elements.

That leaves the third 801(d)(2)(E) element, whether the out-of-court statements were made in the course of and in furtherance of the conspiracy. At the time that the prosecutor requested the court to make findings, there were no specific statements before the court, and it was therefore not possible to determine whether the statements satisfied

15

this element.  However, after the court indicated that it would allow testimony as to Mr. McMahon's out-of-court statements, Ms. Thomas testified that Mr. McMahon talked to her about the primary aim of the conspiracy--using Dallas and Waylon Woods and Mr. Sinclair to testify falsely about the ownership of the shotgun.

Significantly, Mr. Sinclair did not argue to the district court and does not now contend that these statements of Mr. McMahon, assuming that they were made, were not made in the course and in furtherance of the conspiracy.  Mr. McMahon's out-of-court statements, as related by Ms. Thomas, directly concern the government's central contention--that Mr. Sinclair agreed with Mr. McMahon to offer false testimony.  These statements, assuming that they were made, clearly satisfied the third 801(d)(2)(E) element.  The statements were made before the conspiracy's objectives had either failed or been achieved, and were therefore made "in the course of " the conspiracy.  See Perez, 989 F.2d at 1579.  Additionally, the statements were  "'intended to promote the conspiratorial objectives,'" and were therefore made in furtherance of the conspiracy. See United States v. Reyes, 798 F.2d 380, 384 (10th Cir. 1986) (quoting United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982)).  Mr. McMahon's out-of-court statements "explained events important to the conspiracy to one of its members in order to facilitate the conspiracy."  Id.  Although the court made no express findings on the "in the course and in furtherance of " element, and although such express findings are strongly preferred, we believe that this is one of those rare cases in which there is no dispute in the

16

record and in which there is no need to remand the case to the district court for express findings.

Accordingly, we conclude that the district court undertook the requisite inquiry as to whether a conspiracy existed and whether Mr. Sinclair and Mr. McMahon were members of it (the first two Rule 801(d)(2)(E) elements). As to the third Rule 801(d)(2)(E) element, we conclude that once the district court found Mr. McMahon's testimony about the conspiracy to be credible, there was no dispute that the out-of-court statements in question were made in the course and in furtherance of the conspiracy. The district court's failure to make express findings therefore does not require a remand as to any of the Rule 801(d)(2)(E) elements.

### 2. Sufficiency of the evidence

In addition to challenging the district court's failure to make formal findings, Mr. Sinclair also contends that there was insufficient evidence to establish the Rule 801(d)(2)(E) elements. This is a factual question that we review for clear error. See Perez, 989 F.2d at 1580.

We conclude that there is sufficient evidence in the record to support each of the Rule 801(d)(2)(E) elements and that, as a result, the district court did not err in admitting Mr. McMahon's out-of-court statements. As noted above, Mr. McMahon acknowledged that he had previously testified that he asked Mr. Sinclair to testify falsely at the

17

McMahon/Thomas trial and that Mr. Sinclair complied. Although Mr. McMahon was a convicted felon who testified inconsistently on several matters, those inconsistencies do not necessarily undermine his statements about his requesting Mr. Sinclair to commit perjury. Moreover, several other witnesses called by the government supported this part of Mr. McMahon's testimony. It was therefore not clearly erroneous for the district court to believe this part of Mr. McMahon's testimony and to conclude that the government had established the first two Rule 801(d)(2)(E) elements--that a conspiracy existed of which Mr. Sinclair and Mr. McMahon were members.

The third element under Rule 801(d)(2)(E)--that the out-of-court statements were made during the course and in furtherance of the conspiracy--is supported by the testimony of Kandy Thomas. Her testimony about Mr. McMahon's out-of-court statements indicates that the statements were made before the conspiracy objectives had been achieved, that they were intended to promote the conspiracy's objectives, and that they were therefore made in the course of an in furtherance of the conspiracy. See Perez, 989 F.2d at 1578. Thus, the district court did not err in admitting Mr. McMahon's out-of-court statements under Rule 801(d)(2)(E).

### 3. Personal Knowledge

Mr. Sinclair next asserts that the district court erred in admitting certain portions of the testimony of Kandy Thomas and Dallas Woods because they lacked the personal

18

knowledge required by Fed. R. Evid. 602. Mr. Sinclair first raised this issue in a pretrial motion in limine, see Aplt's App., doc. 2, but there is no indication in the record before us as to how the court ruled on the pretrial motion. At trial, Mr. Sinclair renewed his lack of personal knowledge argument as to Kandy Thomas. He again maintained that because of her abuse of narcotics, she lacked personal knowledge of the events of September 9, 1994 and was therefore an incompetent witness. Aplt's App. at 308-310. The district court rejected that argument and allowed her to testify. However, as to Dallas Woods, Mr. Sinclair did not raise the lack of personal knowledge objection at trial. See Aplt's App. at 370-389.

## A.  Dallas Woods

With regard to Dallas Woods's testimony, we must first consider whether the lack of personal knowledge issue is properly before us. In this regard, we have established a three-part test to determine whether it is necessary for the objecting party to renew an objection at trial after a pretrial motion in limine has been denied. Under this three-part test, a party who had filed a motion in limine prior to trial is not required to renew the objection at trial if he or she establishes the following elements: (1) that the issue was adequately presented to the district court when it considered the pretrial motion; (2) that the issue is one that can be finally decided prior to trial; and (3) that the district court issued a definitive ruling on the motion in limine. Pandit v. American Honda Motor Co., Inc., 82 F.3d 376, 379-380 (10th Cir. 1996); Green Construction Co. v. Kansas Power and

19

Light Co., 1 F.3d 1005, 1013 (10th Cir. 1993); United States v. Mejia-Alarcon, 995 F.2d 982, 986-88 (10th Cir.1993).

Here, Mr. Sinclair has failed to satisfy the third element. Because there is no indication in the record as to how the district court ruled on Mr. Sinclair's pretrial motion in limine regarding Dallas Woods's testimony and because Mr. Sinclair did not object to Dallas Woods's testimony at trial, we conclude that Mr. Sinclair has waived the issue in this appeal. See Green Const. Co., 1 F.3d at 1013 (finding waiver when appellant failed to renew objection at trial after trial court indicated that pretrial ruling would be subject to reconsideration at trial); see also United States v. Hanif, 1 F.3d 998, 1002-03 (10th Cir. 1993) (failure to provide an adequate record warrants refusal to consider appellant's argument); McEwen v. City of Norman, 926 F.2d 1539, 1550 (10th Cir. 1991) (same).

## B. Kandy Thomas

Because Mr. Sinclair argued during the trial that Kandy Thomas lacked personal knowledge of the events of September 9, 1994, see Aplt's App. at 308-310, the district court's decision to admit her testimony is properly before us. We review the district court's decision for an abuse of discretion. See United States v. Cestnik, 36 F.3d 904, 906 (10th Cir. 1994).

Although Rule 602 provides that a witness's testimony must be based on personal knowledge, it "does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible . . . only if in the proper exercise of the

20

trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." M.B.A.F.B. Federal Credit Union v. Cumis Ins. Soc., Inc., 681 F.2d 930, 932 (4th Cir. 1982) (citing 2 J. Wigmore, Evidence § 658 (revised by J. Chadbourn 1979); 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 602[02] (1981)).

In challenging the admission of Ms. Thomas's testimony, Mr. Sinclair points to her poor memory regarding the events of September 9, 1994, and notes that she admitted to being "very strung out" on the narcotic Dilaudid on that morning. Aplt's App. at 320. He further notes that other evidence indicated that she abused the sedative Xanax.

Although these facts arguably raise some questions about Ms. Thomas's credibility, drug abuse alone does not render a witness incompetent. United States v. Cook, 949 F.2d 289, 293 (10th Cir. 1991); United States v. Jackson, 576 F.2d 46, 48 (5th Cir. 1978) . Moreover, it is undisputed that Ms. Thomas was present in her apartment on the morning of September 9, 1994, and it is not impossible that she observed the events in question. That Ms. Thomas's testimony detailing such events might be unreliable because of a clouded memory and drug abuse remains a question for the jury. During cross examination of Ms. Thomas, Mr. Sinclair's attorney pointedly explored Ms. Thomas's drug addiction and her clouded memory, specifically showing the jury a photograph taken September 9th documenting Ms. Thomas' drugged appearance.

Remaining confident in the jury's ability to make credibility determinations, we find no abuse of discretion in the trial court's decision to admit Ms. Thomas's testimony.

### 4. Inducements

Mr. Sinclair asserts that the district court violated his constitutional right to confront the witnesses against him by refusing to allow cross-examination of Peter McMahon about a confidential meeting between Mr. McMahon and the prosecutor. Mr. Sinclair states, "In that meeting, according to Mr. McMahon, the prosecutor was prepared to offer additional leniency to Mr. McMahon if he would testify that Mr. Sinclair was somehow involved in the untimely death of Mr. Sinclair's wife." Aplt's Br. at 31.

We review de novo whether a defendant's confrontation rights were violated by reason of improper cross-examination restrictions. United States v. Pedraza, 27 F.3d 1515, 1529 (10th Cir 1994). However, the district court "'retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Id. at 1529 (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)); see also United States v. Swingler, 758 F.2d 477, 497 (10th Cir. 1985). "'The Sixth Amendment guarantees an opportunity for effective cross examination, not cross examination that is effective in whatever way, and to whatever extent, the defense

22

might wish.'" Pedraza, 27 F.3d at 1529 (quoting Fensterer, 474 U.S. at 20) (emphasis in original). Additionally, we recognize the district court's discretion under Fed. R. Evid. 403 to exclude relevant evidence likely to cause unfair prejudice, confusion, or undue delay substantially outweighing its probative value. Our duty in reviewing the adequacy of the cross-examination is to determine "'whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias.'" Swingler, 758 F.2d at 498 (quoting United States v. De Gudino, 722 F.2d 1351, 1354 (7th Cir. 1983)).

In this instance, the existence of the alleged offer of leniency in exchange for Mr. McMahon's testimony implicating Mr. Sinclair in his wife's death remains highly doubtful. The prosecutor indicated that Mr. Sinclair's statement about the offer was "absolutely and completely false." Aplt's App. at 280. Mr. Sinclair's attorney responded that the only reason for his belief in this undocumented inducement was Mr. McMahon's statement. Id. The lack of factual support for the occurrence of the alleged inducement thus supports the district court's decision not to allow cross-examination about it.

Moreover, even without knowledge of this alleged inducement, the jury had sufficient information to make a discriminating appraisal of Mr. McMahon's motives and bias. Mr. Sinclair's attorney cross-examined Mr. McMahon about his agreement to plead guilty to a charge of conspiring to commit perjury in return for a recommendation that his sentence should run concurrently with his sentence for the firearm conviction. Prior to the Sinclair trial, Mr. McMahon was in fact given a concurrent sentence and stood by his

23

guilty plea. Additionally, during direct examination, Mr. McMahon disclosed to the jury that he was testifying under a grant of immunity and that his truthful testimony was ordered by the court. The jury also heard evidence concerning Mr. McMahon's past crimes and drug use. Therefore, we are confident that the jury could evaluate Mr. McMahon's testimony with understanding of his motives and potential bias. Accordingly, the district court did not violate Mr. Sinclair's confrontation rights by refusing to allow cross-examination about the alleged inducements to Mr. McMahon.

### 5. Disclosure of Identity of Confidential Informant

Mr. Sinclair asserts that the district court erred in failing to order the government to disclose the identity of the confidential informants who made two controlled buys of narcotics from Peter McMahon. Mr. Sinclair argues that these informants observed the narcotics dealing by Mr. McMahon and Ms. Thomas, the effect of drug addiction on Ms. Thomas, and the transporting of firearms to and from the McMahon/Thomas apartment. Mr. Sinclair contends that this information relates directly to his defense and could have been used to impeach the testimony of Mr. McMahon and Ms. Thomas. He maintains that the need for the potentially impeaching testimony from the informant outweighs the public need to protect confidential communications to law enforcement.

The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law

24

enforcement against an individual's right to prepare his defense. Roviaro v. United States, 353 U.S. 53, 62 (1957). In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony. Id. "Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure." United States v. Martinez, 979 F.2d 1424, 1429 (10th Cir. 1992). A defendant seeking disclosure has the burden of proof, and we review the district court's decision for an abuse of discretion. Id. at 1426.

Applying these standards, we are not persuaded by Mr. Sinclair's argument. Significantly, Mr. Sinclair does not suggest that the confidential informants could provide direct evidence regarding the central issue in his perjury trial--whether Mr. Sinclair lied when he testified about the delivery of the shotgun on September 9, 1994. Rather, Mr. Sinclair explains that the disclosure is necessary in order for him to adequately impeach the government's witnesses on the basis of their criminal activity and drug abuse. However, both the prosecution and the defense presented other substantial evidence regarding Mr. McMahon's and Ms. Thomas's crimes and drug use. There is no indication that the confidential informant could amplify or explain the impeachment evidence already before the jury. On the contrary, any testimony from the informant would be cumulative at best. Therefore, the defendant failed to establish that the

25

confidential informant could aid in his defense or that his need for disclosure outweighed the public's need to protect the informant's identity. The district court thus acted within its discretion in denying Mr. Sinclair's request for disclosure.

## 6. Sentencing Offense Level Adjustment

Mr. Sinclair asserts that the district court erred in assessing a three-point upward adjustment of his offense level pursuant to United States Sentencing Guidelines (USSG) § 2J1.3(b)(2) for substantial interference with the administration of justice. Section 2J1.3 establishes a base offense level of twelve for convictions for perjury, subornation of perjury, and bribery of a witness. Section 2J1.3(b)(2) provides that "[i]f the perjury . . . resulted in substantial interference with the administration of justice, increase [the offense level] by 3 levels." Application Note 1 to USSG § 2J1.3 explains that "'[s]ubstantial interference with the administration of justice' includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." (Emphasis added).

Focusing on the language of the Application Note, Mr. Sinclair contends that the prosecution failed to establish that his perjured testimony caused an unnecessary expenditure of substantial government or court resources. This argument addresses a

26

factual determination by the district court that we review for clear error. See United States v. DeSalvo, 26 F.3d 1216, 1224 (2d Cir.1994).

The basis for the USSG § 2J1.3(b)(2) enhancement is set forth in the presentence report, which concludes that if Mr. Sinclair had told the truth about the events of September 9, 1994, "the government would have been prepared to perform a thorough cross examination of the two witnesses that followed him, Dallas and Waylon Woods." Aplt's App, doc. 15, at 8. "It is also likely," the presentence report continues, "that truthful testimony from [Mr.] Sinclair would have changed the course of the entire trial." Id. According to the report, the McMahon/Thomas trial would have been shorter in that the prosecutor would not have been required to re-interview the boys during a break in the trial, to recall them as witnesses, and to elicit testimony from Mr. McMahon about the conspiracy to offer false testimony. In supporting the three-point upward adjustment in the offense level, the presentence report also refers to the resources that the government expended in trying him on the instant perjury charge. Id. [5]

_____

[5] The presentence report's complete discussion of the factors supporting the three-level increase in the offense level reads as follows:

> Had Sinclair testified truthfully at McMahon's trial, he could have saved the unnecessary expenditure of substantial government and court resources. Sinclair was the first witness to testify on behalf of McMahon at McMahon's trial. Had he told the truth concerning the events of September 9, 1994, the government would have been prepared to perform a thorough cross examination of the two witnesses that followed him, Dallas and Waylon Woods. It is also likely that truthful testimony from Sinclair would have changed the

27

The district court accepted this reasoning, characterizing Mr. Sinclair's perjured testimony as the "cornerstone" of the defense at the McMahon/Thomas trial and stating that "there is no reason . . . to believe that the additional witnesses, specifically Dallas and Waylon Woods, would have ever testified, yet alone falsely, without the foundation provided by Mr. Sinclair." Aplt's App. at 424.

As we have not yet construed the phrase "the unnecessary expenditure of governmental or court resources" in applying USSG § 2J1.3(b)(2), we turn to the

---

course of the entire trial. It is likely that McMahon's defense and his trial would have been shorter. The defense may not have called Dallas and Waylon Woods as defense witnesses or it may have influenced two young witnesses to tell the truth once called to testify. Had Sinclair told the truth, Sinclair would have protected himself from possible criminal prosecution. As events eventually unfolded, the government was forced to re-interview Dallas and Waylon Woods on the evening after their first day of testimony. Because they followed Sinclair and lied on the first day, the government was forced to have them and their father, Ron Woods, appear in court a second day and recant their original testimony. McMahon himself also had to testify concerning the scheme In addition, Sinclair failed to appear in Court as directed and was not available for further testimony regarding these [sic] turn of events. Although he was indicted, he pleaded not guilty and despite the evidence against him, exercised his right to a jury trial. After the government's expense and preparation for trial, and the Court's use of resources to try him, Sinclair was convicted.

Aplt's App. doc. 15, at 8.

decisions of other circuits for guidance.  Initially, we note that "expenses associated with the underlying perjury offense should not form the basis of an upward adjustment." United States v. Duran, 41 F.3d 540, 546 (9th Cir. 1994); see also United States v. Jones, 900 F.2d 512, 522 (2d Cir. 1990).   Additionally, the Eleventh Circuit has held that pre-perjury investigative efforts should not be used as a basis of enhancement because the waste of resources did not result from the offense.  See United States v. Leeper, 886 F.2d 293, 294-95 (11th Cir. 1989).  We are persuaded by these decisions.   Thus, contrary to the reasoning of the presentence report, the government's preparation for Mr. Sinclair's perjury trial and the court's expenditure of time and resources in trying him on that offense cannot be used to support the USSG § 2J3.1(b)(2) upward adjustment in the offense level.

Other circuits have also concluded that substantial interference with the administration of justice may be inferred if the defendant concealed information of which he is the only known source.  See  United State v. Bradach, 949 F.2d 1461, 1463 (7th Cir. 1991); Jones, 900 F.2d at 522.  However,  decisions affirming the three-level enhancement of the offense level under USSG § 2J1.3(b)(2) have generally involved government and court expenditures significantly more extensive than those listed in Mr. Sinclair's presentence report.  See United States v. Atkin, 29 F.3d 267, 268 (7th Cir. 1994) (government required to summon five additional grand jury witnesses from many miles away); United States v. Butt, 955 F.2d 77, 88 (1st Cir. 1992) (government required

to locate and examine several more witnesses and to immunize persons whom it might have otherwise prosecuted); Bradach, 949 F.2d at 1463 (false testimony impaired the grand jury proceedings and necessitated four perjury related trials in three years); United States v. Lueddeke, 908 F.2d 230, 234 (7th Cir. 1990) (FBI spent two full weeks trying to sort out the truth).

It is debatable whether the initial testimony of Dallas and Waylon Woods and the prosecution's re-interviewing and recalling of them at the McMahon/Thomas trial involved a substantial expenditure of government or court resources. See J. A. Simpson and E.S.C. Weiner eds. XVII Oxford English Dictionary at 67 (2d ed. 1989) (defining "substantial" as "of ample or considerable amount, quantity, or dimensions"). Given this limited evidence, a sentencing judge might reasonably conclude that the expenditure of resources was not substantial and the USSG § 2J1.3(b)(2) increase in the offense level was not justified. However, the opposite conclusion--that the expenditure was substantial such that the enhancement was warranted--also finds support in the record. As the government notes, it "need not particularize a specific number of hours expended by government employees" in order to support the USSG § 2J1.3(b)(2) enhancement. Jones, 900 F. 2d at 522. Moreover, the district court made a specific finding that the perjured testimony offered by Mr. Sinclair at the McMahon/Thomas trial constituted the "cornerstone" of the defense and led to the false testimony of Dallas and Waylon Woods and to the prosecution's re-interviewing and recalling of them. Aplt's App. at 424. In

light of the deference that we afford the district court regarding these factual determinations, we cannot say that its conclusion that Mr. Sinclair's perjury resulted in the substantial expenditure of resources is clearly erroneous. Accordingly, we affirm the three-level increase in Mr. Sinclair's offense level pursuant to USSG § 2J1.3(b)(2).

### III. Conclusion

We AFFIRM Mr. Sinclair's conviction and sentence.