F I L E D
United States Court of Appeals
Tenth Circuit

APR 12 1999

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEWIS SAMUEL GORDON, also
known as Chris Jonston,

Defendant-Appellant.

No. 98-2100

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CR-97-449-JP)

Peter Schoenburg, of Rothstein, Donatelli, Hughes, Dahlstrom, Cron &
Schoenburg, LLP, Albuquerque, New Mexico, for the appellant.

J. Miles Hanisee, Assistant United States Attorney, (John J. Kelly, United States
Attorney, with him on the brief), Albuquerque, New Mexico, for the appellee.

Before **SEYMOUR**, Chief Judge, **BALDOCK,** and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendant Lewis Gordon was charged and convicted by jury of possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841. He was sentenced to 151 months' imprisonment. On appeal, he contends the district court erroneously denied his motion to suppress statements and evidence, his motion to disclose the identity of a confidential informant, and his motion for new trial based on prosecutorial misconduct. We affirm.

I.

On June 27, 1997, Gordon purchased a one-way Amtrak ticket from Los Angeles to Chicago under the name of Chris Jonston. He purchased the ticket with cash, ten minutes before the train's departure.

An Amtrak employee (the informant/tipster) in Los Angeles contacted DEA Agent Kevin Small in Albuquerque and advised him of the circumstances surrounding the purchase of the ticket.[1] Small relayed the name and physical description of the ticket holder to DEA Task Force Officer Jeanette Tate, who verified the ticket purchase with a passenger itinerary printout. Tate telephoned the call-back number listed on the itinerary for Chris Jonston and reached the

---

[1] DEA Agents are particularly suspicious of individuals who purchase one-way tickets with cash shortly before a train's departure. To facilitate DEA interdictions, an Amtrak employee with access to the computer reservation system is stationed at the Albuquerque DEA office. Amtrak employees frequently provide tips to DEA agents and occasionally receive cash awards if the tips prove fruitful. No cash award was given in this case.

answering machine of Robert Anderson.

Tate and DEA Task Force Officer Nina Bruce met the train in Albuquerque and located Gordon in car 413. With her tape recorder running, Tate showed Gordon her credentials and asked if he would talk to her. Gordon did not object. He identified himself as Lewis Gordon, but provided a ticket stub bearing the name of Chris Jonston, explaining he was "traveling" under that name. Tate asked if Gordon had any luggage and Gordon pointed to two bags. Tate asked if she could search the bags and, after mumbling inaudibly, Gordon replied, "Yeah." Aplt's App. at 48. Gordon and the agents went to the lower level of the train car to search the bags. Tate opened one of the bags and discovered a smaller padlocked duffle bag inside. Tate asked Gordon if he could open the bag. In response, Gordon took a key from his pocket and handed it to Tate. Gordon did not object to the opening of the padlocked bag. In her search of the bag, Tate found $28,000 in United States currency and two brick-shaped, cellophane-wrapped packages. Gordon, a former marine, explained he had been in Los Angeles for an informal reunion and "Rick" asked him to deliver a bag to Rick's girlfriend in Chicago. Gordon stated he was unaware of the contents of the locked bag, although Rick had given him the key to the bag. Gordon was arrested and was taken to the Albuquerque DEA Office. The contents of the cellophane-wrapped packages were tested and found to be 8.97 kilograms of cocaine.

## II.

## Motion to Suppress

Gordon moved to suppress all physical evidence seized from a locked duffle bag  and all statements he made to authorities during the encounter on the train.  He argued the search of the locked duffle bag exceeded the scope of his consent, and that Tate lacked probable cause to arrest him based only on discovery of the cellophane-wrapped packages.  The district court denied the motion, ruling (1) Gordon consented to the search of the locked bag based either on his initial consent to the search of his bags or his voluntary relinquishment of the padlock key to Tate, and (2) the combination of the money and the cellophane-wrapped packages found in the locked bag constituted probable cause to arrest.

In reviewing the district court's denial of a motion to suppress, we accept the court's factual findings unless they are clearly erroneous and consider the evidence in the light most favorable to the government.  The ultimate question of whether a search and seizure were reasonable under the Fourth Amendment is a question of law we review de novo.    United States v. Glover   , 104 F.3d 1570, 1576 (10th Cir. 1997).

Consent to search locked bag

We need not rely on Gordon's initial consent to search his bags in order to affirm the denial of Gordon's motion to suppress evidence seized from the locked duffle bag. We agree with the district court that Gordon's voluntary relinquishment of the key evidenced his consent to search the locked duffle bag.

Gordon correctly points out Tate did not advise Gordon he did not have to answer her questions and that he was free to leave, did not state with precision the object for which she was searching, and did not explicitly identify herself as a police officer. A search, however, does not become non-consensual merely because an officer fails to do any or all of these things. See United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994). Rather, Tate's failure to more clearly express the objects of her requested search and her failure to plainly identify herself are mere factors to be considered in determining whether, under the totality of the circumstances, the search was consensual. See id.

When all of the circumstances are considered, Gordon's consent is apparent. Tate asked to see Gordon's ticket and identification, inquired as to his travel plans, and asked if he had any luggage. A written transcript of the conversation, while not entirely complete because of the poor quality of the recording, reveals Tate asked questions and did not fire orders at Gordon or otherwise attempt to intimidate Gordon. This is consistent with Tate's testimony.

Tate and Gordon both testified that, at a minimum, Tate showed her badge to Gordon when she approached him. Tate also advised Gordon she was "working interdiction" and "check[ing] for passengers who are traveling back east from the west coast." Aplt's App. at 85. In addition, after obtaining consent to search Gordon's luggage but before obtaining consent to search the locked bag, Tate asked Gordon, "Do you have any contraband in here, Lewis?" Id. at 86. Although Gordon might not have known exactly the object of Tate's search, at that point he knew Tate was searching for contraband.

When Tate encountered the locked bag, she asked Gordon, "Can you open that?" Aplt's App. at 86. Gordon apparently did not respond verbally but removed the key from his pocket and handed it to Tate. Non-verbal conduct, considered with other factors, can constitute voluntary consent to search. See United States v. Flores, 48 F.3d 467, 469 (10th Cir. 1995); United States v. Benitez, 899 F.2d 995, 998 (10th Cir. 1990). Gordon contends Tate ordered him to unlock the bag and complains he felt obligated to comply with the order. Based on Tate's testimony and a review of the recording transcript, the district court found otherwise, noting Gordon "reached in his pocket voluntarily to give her the key." Record II at 185. As this factual finding is not clearly erroneous, we have no basis for rejecting it.

Moreover, and perhaps most significantly, Gordon did not object to a

search of the locked bag when Tate asked Gordon, "Can you open that?" or when Tate actually searched the bag. See Jimeno, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent. See United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998); United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996); United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996); Wacker, 72 F.3d at 1470; United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994).

In sum, Gordon gave a broad and unlimited consent to search his bags. When Tate came across a smaller padlocked bag inside the larger bag, Gordon voluntarily and without objection handed her the key in response to her asking him, "Can you open that?" Tate reasonably construed Gordon's response as consent to search the locked bag.

Probable cause to arrest

"Law enforcement personnel may arrest a person without a warrant if there is probable cause to believe that person committed a crime." United States v. Wright, 932 F.2d 868, 877 (10th Cir. 1991). To determine if probable cause

existed for a warrantless arrest, we examine if, at the time of arrest, the facts and circumstances within the officer's knowledge and of which the officer had reasonably trustworthy information were sufficient to warrant a prudent officer in believing the defendant had committed or was committing a crime. United States v. Snow, 82 F.3d 935, 942 (10th Cir. 1996). "Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer." Id. (quoting United States v. Morgan, 936 F.2d 1561, 1568 (10th Cir. 1991)). We review de novo the district court's determination of probable cause, while we review its findings of historical fact for clear error, United States v. Barron-Cabrera, 119 F.3d 1454, 1457 (10th Cir. 1997).

Gordon argues Tate's viewing of the cellophane-wrapped packages alone was insufficient to create probable cause. Our view of the evidence is not that limited. We determine the existence of probable cause to arrest based on the totality of the circumstances. See United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998). By focusing narrowly on Tate's failure to establish before the arrest that the cellophane-wrapped packages contained cocaine, Gordon in essence asks that we fundamentally alter the nature of the probable cause requirement from one based on a reasonably fair likelihood of criminal conduct to one satisfied only upon a positive showing of criminal conduct. Such a high threshold is inconsonant with the nature of our inquiry. Probable cause rests on a

reasonable probability that a crime has been committed, not on certainty that illegal activity is afoot.     See id. ("Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion.");     United States v. Buchanan  , 70 F.3d 818, 826 n.5 (5th Cir. 1995);     United States v. Potter  , 895 F.2d 1231, 1234 n.1 (9th Cir. 1990) (rejecting defendant's argument that officer "should have tested the powder to make sure it was methamphetamine before arresting him")  .

Tate clearly had probable cause to arrest Gordon.  At the time of arrest, Tate knew Gordon (1) had purchased a one-way ticket with cash only minutes before the train departed, (2) was traveling under another name, (3) was carrying a large amount of cash (later determined to be $28,000 bundled in $20 bills), and (4) had in his possession two brick-shaped, cellophane-wrapped packages, a type of packaging Tate testified is commonly used to transport narcotics.  This combination of facts could lead a reasonable officer to believe Gordon was committing or had committed a crime.     See United States v. Harlan  , 35 F.3d 176, 179 (5th Cir. 1994) (probable cause to arrest where individual had one-way ticket purchased with cash, gave misleading information, had $8,000 in cash, and had "large bulge" in his jacket);     United States v. Prandy-Binett   , 995 F.2d 1069, 1071 (D.C. Cir. 1993) (probable cause to arrest where individual possessed rectangular package wrapped in silver duct tape, gave deceptive answers to officers'

questions, and moved quickly through train station when he realized he was being watched); United States v. Taylor, 956 F.2d 572, 578 (6th Cir. 1992) (probable cause to arrest where individual paid cash for one-way ticket from source city, provided implausible answers to officers' questions, and search of bag revealed "two spherical, tape-bound parcels"); United States v. Tartaglia, 864 F.2d 837, 841-42 (D.C. Cir. 1989) (facts that individual paid cash for one-way ticket and call-back number was out of service were properly considered in probable cause analysis); see also United States v. Mendez, 27 F.3d 126, 129 (5th Cir. 1994). The district court properly determined Tate had probable cause to arrest Gordon.

### Identity of Informant

Gordon filed a pretrial motion for disclosure of the identity of the Amtrak employee who divulged information regarding Gordon's ticket purchase. Gordon claimed the tip was not based on any legitimate articulable grounds but solely on the basis of Gordon's race, in violation of the Equal Protection Clause. The motion was denied because the court had "not seen anything . . . that creates any alarm or raises any suspicion in me that this was a race-based tip." Aplt's App. at 209.

A defendant seeking to force disclosure of an informant's identity has the burden to show the informant's testimony is relevant or essential to the fair determination of defendant's case. In determining whether to require disclosure,

-10-

a court must balance the public interest in protecting the flow of information against the individual's right to prepare his defense. Roviaro v. United States, 353 U.S. 53, 62 (1957). The court conducts this balancing in light of the crime charged, the possible defenses, and the significance of the informant's testimony. United States v. Sinclair, 109 F.3d 1527, 1538 (10th Cir. 1997). "Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret [the informant's] identity must prevail over the defendant's asserted right of disclosure." Id. (quoting United States v. Martinez, 979 F.2d 1424, 1429 (10th Cir. 1992)). We review a district court's denial of a motion to disclose for abuse of discretion. See Sinclair, 109 F.3d at 1538.

The informant's role in Gordon's arrest was extremely limited. The informant did not detain Gordon, and did not participate in or witness Gordon's detention or the transaction in which Gordon purportedly agreed to transport cocaine in exchange for money. We have refused disclosure in similar cases where the informant has limited information, was not present during commission of the offense, and cannot provide any evidence that is not cumulative or exculpatory. See United States v. Brantley, 986 F.2d 379, 383 (10th Cir. 1993); United States v. Mendoza-Salgado, 964 F.2d 993, 1001 (10th Cir. 1992); United States v. Scafe, 822 F.2d 928, 933 (10th Cir. 1987); United States v. Halbert, 668 F.2d 489, 496 (10th Cir. 1982). The Amtrak employee here simply provided a

lead and in that sense was a mere "tipster" whose identity and testimony are unrelated to any issue in Gordon's case. See United States v. Wynne, 993 F.2d 760, 766 (10th Cir. 1993); United States v. Moralez, 917 F.2d 18, 19 (10th Cir. 1990); United States v. Zamora, 784 F.2d 1025, 1030 (10th Cir. 1986) ("if a confidential informant was only a 'tipster,' and not an active participant in the criminal activity charged, disclosure of the informant's identity is not required").

Gordon makes much of the fact that the description provided by the informant referenced his race and from that he reasons the tip was race-based. This rampant speculation is not supported by any evidence in the record. We will not require disclosure of an informant's identity based on "mere speculation"; the informant's testimony must be shown to be valuable to the defendant. United States v. Leahy, 47 F.3d 396, 398 (10th Cir. 1995). Gordon ignores the evidence that prompted the Amtrak employee to contact the DEA in the first place -- he had purchased a one-way ticket, with cash, only minutes before the train departed. The Amtrak employee contacted the DEA after noting these facts because the employee previously had been told by the DEA that these facts fit the DEA profile of an individual who is a likely transporter of drugs.

Gordon has failed to satisfy his burden of demonstrating disclosure of the informant's identity would contribute meaningfully to his defense. In addition, the totality of the circumstances does not permit even a remote inference that the

-12-

tip was race-based.

## Motion for New Trial

Gordon timely filed a motion for new trial, arguing prosecutorial misconduct during cross-examination violated his right to a fair trial. Gordon made several references to his four children during his direct examination, noting he had purchased clothing for them in Los Angeles and had discussed the children with Tate at the time of his arrest. The following exchange occurred during cross-examination:

> Q: Mr. Gordon, where are your four children now?
> A: I have two sons in Wisconsin. My oldest daughter is in North Carolina, and my youngest daughter is in Joliet, Illinois.
> Q: And did you claim these children as dependents when you were in the military?
> A: One. The others I didn't have when I was in the military.
> Q: Is your check at work garnished so that you can pay support for these children?
> Defense Counsel: Your Honor, I would object and ask to approach.
> The Court: Yes, please come up to the bench.
> Defense Counsel: Judge, I am going to object and move for a mistrial.
> Prosecutor: He is testifying.
> The Court: Well, the specific question is whether his check has been garnished. What is the probative value of that?
> Prosecutor: Your Honor, it tends to show why he is carrying drugs and attempting to make large quantities of money, because he is unable to support--provide support otherwise.
> The Court: Well, I think that the probative value of that information is significantly outweighed by the danger of unfair prejudice. I am going to keep it out under Rule 403.
> Defense Counsel: Judge, I would also like to move for a mistrial. We did not get into his family situation or his kids. This is

just a complete cheap shot.

  The Court:  Mistrial on what?

  Defense Counsel:  On the basis of introducing this as totally extraneous and prejudicial.

  The Court:  I will instruct the jury to disregard the last question.  There is no basis for a mistrial. . . .

    (Whereupon, in the presence of the jury.)

  The Court:  Members of the jury, I am going to instruct you to disregard the last question.  Remember what I have told you before.  The questions, the statements, the arguments, the objections, the explanations by the lawyers are not evidence in the case.

Aplt App. at 602-03.  Gordon contends the mere asking of the "garnishment" question was "devastating," as it undermined his credibility and

> raised in the jurors' minds a stereotyped image of an unsavory character: a young Black man with children by apparently different mothers, who has been irresponsible and has not supported his children to the point that the state had to intervene, and who was likely to resort to drug trafficking not only out of necessity, but because it is part of his life style.

Aplt Br. at 43.

We review the district court's denial of a motion for new trial based on prosecutorial misconduct for abuse of discretion.  See United States v. Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996).  We engage in a two-step process in reviewing claims of prosecutorial misconduct.  First, we determine if the conduct was improper.  Second, we determine if any improper conduct warrants reversal.  United States v. Lonedog, 929 F.2d 568, 572 (10th Cir. 1991).  Reversal is necessary only if the improper conduct influenced the verdict.  United States v. Alexander, 849 F.2d 1293, 1296 (10th Cir. 1988).  In determining whether

-14-

misconduct affected the outcome of a trial, we consider "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." Lonedog , 929 F.2d at 572 (quoting United States v. Martinez-Nava , 838 F.2d 411, 416 (10th Cir. 1988)).

We agree with the district court that the prosecutor's question was improper in that the potential for prejudice to Gordon outweighed any probative value of any response the question would have elicited. However, we do not conclude this improper conduct warrants reversal of Gordon's conviction in this case. Here, the district court promptly instructed the jury to disregard the question and reiterated that "questions . . . by the lawyers are not evidence in the case." Absent evidence to the contrary, we assume the jury follows a curative instruction. See United States v. Iribe-Perez , 129 F.3d 1167, 1171 (10th Cir. 1997); see also Greer v. Miller , 483 U.S. 756, 766 (1987) (prejudicial effects of improper question generally cured by objection and issuance of curative instruction). In addition, the purported misconduct is insignificant when the trial is considered as a whole. It consisted of a single question in a two-day proceeding that was not answered by Gordon nor commented on by the prosecutor in closing argument. Cf. Longdog , 929 F.2d at 573 (no prejudice where improper question not answered). Because the effect of any misconduct in asking the question was exceedingly slight, the district court did not abuse its discretion in denying Gordon's motion for new

-15-

trial.  See United States v. Ivy  , 83 F.3d 1266, 1288 (10th Cir. 1996).

AFFIRMED.