**F I L E D**

PUBLISH

**September 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHARLES ELLWOOD GWATHNEY,

    Defendant - Appellant.

No. 05-2165

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-04-1553 WPJ)**

---

Laura Fashing, Assistant United States Attorney (David C. Iglesias, United States Attorney, on the briefs), Albuquerque, New Mexico, for Plaintiff - Appellee.

James P. Baiamonte, Albuquerque, New Mexico, for Defendant - Appellant.

---

Before **O'BRIEN, McWILLIAMS** and **McCONNELL**, Circuit Judges.

---

**O'Brien**, Circuit Judge.

---

During an inspection of Charles Ellwood Gwathney's commercial truck, Officer James Smid of the New Mexico Motor Transportation Division discovered 152.5 kilograms of marijuana. Gwathney was convicted by a jury of possession

of 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(b)(1)(b)(vii). He challenges the district court's denial of his motion to suppress evidence obtained from the search, the admission of certain government evidence, the giving of a "permissive inference" jury instruction, and the district court's denial of his motion for a new trial based on newly discovered evidence. We affirm.

**Background**:

On May 23, 2004, Gwathney, a commercial truck driver, stopped at the Gallup, New Mexico Port of Entry along Interstate 40 near the Arizona-New Mexico state line to obtain a trip permit through New Mexico for his load of potatoes.[1] The truck was owned by Solomon Shaw. Officer Smid asked Gwathney for his driver's license, medical card, tractor and trailer registration, log book and bill of lading, all of which were provided. The bill of lading listed the truck as carrying 833 boxes of red potato creamers, required the truck to be maintained at forty-two degrees and was signed by Gwathney. The log book

---

[1] "New Mexico law requires all commercial carriers entering or leaving New Mexico to stop at all ports of entry." *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1209 (10th Cir. 2001) (citing N.M. Stat. Ann. § 65-5-1(A)). "The state authorizes personnel assigned to the ports of entry to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with state laws regarding public safety, health, and welfare." *Id*. (citing N.M. Stat. Ann. § 65-5-1). "New Mexico has also authorized its employees to enforce federal laws relating to commercial motor vehicle carriers." *Id*. at 1211 (citing N.M. Stat. Ann. § 65-1-9).

indicated potatoes had been loaded on the truck in Phoenix on May 21, but that Gwathney did not leave Phoenix until May 23. Although the truck was refrigerated, Officer Smid thought it unusual Gwathney would load the potatoes prior to having his truck repaired because potatoes are perishable goods.[2] Officer Smid asked Gwathney why he had taken over a day to leave Phoenix after his truck was loaded. Gwathney explained the delay was caused by repairs he had made to his truck. Gwathney provided Officer Smid an invoice for the repair work. The invoice showed the repair work to have been completed on May 21. It also indicated Gwathney paid almost $14,000 in cash for the repairs.

Officer Smid instructed Gwathney to pull the truck into a bay where he would conduct a level 2 inspection.[3] After checking the outside of the truck, Officer Smid instructed Gwathney to unlock the doors to the trailer. Upon opening the doors, Officer Smid discovered one of the pallets had tipped against the wall of the truck during transit. Officer Smid used a ladder to climb over the potatoes to make sure the rest of the pallets were secure and in place. While climbing over the leaning pallet, Officer Smid detected shoe prints and crushed boxes indicating someone had walked on the pallets after they were loaded on the truck. Officer Smid followed the footprints and smashed boxes until he reached

---

[2] Officer Smid also testified the refrigeration unit on Gwathney's trailer was leaking and "in bad shape." (R. Supp. Vol. I at 75.)

[3] "Inspectors conduct three levels of inspections at the inspection bays. Of these, Level 1 is the most thorough." *Vasquez-Castillo*, 258 F.3d at 1209.

an open area in the truck. There, he discovered several large non-conforming brown boxes that had numbers spray-painted on them and were wrapped in brown packing tape. They did not have the word "Potato" on them, and Officer Smid believed them to contain contraband.[4] At that point, Officer Smid crawled out of the truck and handcuffed Gwathney for the officer's protection while he continued his search. Upon returning to the boxes, Officer Smid cut them open and discovered what eventually was determined to be 152.2 kilograms of marijuana.[5] Officer Smid then arrested Gwathney.

On August 11, 2004, Gwathney was indicted for possession with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). On August 30, 2004, Gwathney filed a motion to suppress the evidence found in the commercial trailer. He argued Officer Smid lacked probable cause to conduct a special safety search. After an evidentiary hearing, the district court denied Gwathney's motion.

Beginning December 15, 2004, Gwathney was tried before a jury. At trial, Gwathney claimed he had no knowledge of the drugs on his truck. He explained the payment of $14,000 in cash for the truck repairs came from money wired to

---

[4] The potatoes were loaded on pallets, packed in white boxes, marked as "Potato," and had handles allowing the contents to be visible. (R. Vol. III at 44.)

[5] The value of the drugs in Phoenix, the source of the load, was estimated at $168,000 to $252,000. The value of the drugs in New York, the destination of the load, was estimated at $336,000 to $672,000.

him by Solomon Shaw, who sent the money via Western Union. In rebuttal, the government introduced Exhibit 55 - an administrative subpoena directed toward Western Union requiring the provision of any wire transfer records for Gwathney, or Solomon Shaw from May 13, 2004 through May 23, 2004, coupled with Western Union's response that it could find no such records. Gwathney objected to the admission of the evidence based on the lack of an adequate foundation. The district court allowed admission of Western Union's response based on the business record exception of Rule 803(6) of the Federal Rules of Evidence.

At the close of the case, the district court gave the jury a permissive inference instruction pertaining to Gwathney's knowledge of the marijuana in his truck. Jury Instruction 13 provided:

> With respect to the question of whether or not a defendant knew that the controlled substance was present, you may - but are not required to - infer that the driver and sole occupant of the tractor-trailer rig has knowledge of the controlled substance within it. This inference does not relieve the government of its obligation to prove all of the elements of the offense beyond a reasonable doubt.

(R. Supp. Vol. II at 355-56.) On December 16, 2004, the jury convicted Gwathney.

On May 11, 2005, Gwathney filed a motion for a new trial based on newly discovered evidence. The new evidence was a Western Union wire transfer receipt showing a transfer of $921.00 from Solomon Shaw to Gwathney on May 14, 2004, which contradicted Western Union's report attached to Exhibit 55. On

May 25, 2005, the district court denied the motion. On May 27, 2005, Gwathney was sentenced to 137 months' imprisonment. He filed a timely notice of appeal on June 1, 2005.

**Discussion**:

Gwathney challenges the district court's denial of his motion to suppress, the admission of Exhibit 55 into evidence, jury instruction number 13 and the district court's denial of his motion for a new trial. We consider each in turn.

**I. Motion to Suppress**

We review warrantless searches under the Fourth Amendment for reasonableness. Reasonableness is a question of law we review de novo. *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999). We accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the district court's determination. *Id.*

When warrantless searches of closely regulated industries are at issue, we apply the test articulated by the Supreme Court in *New York v. Burger*, 482 U.S. 691 (1987). *See United States v. Johnson*, 408 F.3d 1313, 1320 (10th Cir.), *cert. denied*, 126 S.Ct. 458 (2005); *Vasquez-Castillo*, 258 F.3d at 1210. Commercial trucking is a closely regulated industry. *United States v. Burch*, 153 F.3d 1140, 1141-43 (10th Cir. 1998). Thus, under *Burger*, a warrantless search of a commercial truck satisfies the Fourth Amendment where: (1) there is a substantial government interest underlying a regulatory scheme authorizing the search, (2)

the warrantless search is necessary to further the regulatory scheme, and (3) the inspection program provides a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 701-03; *Vasquez-Castillo*, 258 F.3d at 1210.

The search at issue in this case is almost identical to the one we confronted in *Vasquez-Castillo*. There we examined the level 1 inspection of a commercial truck by the New Mexico Motor Transportation Division at its port of entry along Interstate 40 on the opposite side of the state near San Jon, New Mexico. *Vasquez-Castillo*, 258 F.3d at 1208-09. That inspection revealed 800 pounds of marijuana concealed in a hidden compartment in the trailer. *Id*. at 1210. We applied the *Burger* test to analyze whether the inspection officer's warrantless entry into the truck was justified. Relying on our previous decision in *V-1 Oil Co. v. Means*, we noted that "'[t]he state clearly has a substantial interest in regulating commercial carriers to protect public safety on the highways.'" *Vasquez-Castillo*, 258 F.3d at 1211 (quoting *Means*, 94 F.3d 1420, 1426 (10th Cir. 1996)). Thus, we held New Mexico's "safety inspections of commercial carriers satisfy the first prong of the *Burger* test." *Id*. We also held New Mexico's "routine safety inspections [were] necessary to further the regulatory scheme governing commercial carriers," thus satisfying the second prong of the *Burger* test. *Id*. Finally, we examined New Mexico's requirement that "all commercial motor vehicle carriers stop at every point of entry" and the

authorization to inspect blocking and bracing inside the trailer,[6] and held the regulations provided adequate notice to owners of commercial property it would be subject to periodic inspections for specific purposes, limited in time, place and scope. *Id*. at 1211, 1212 (discussing N.M. Stat. Ann. § 65-5-1). Thus, New Mexico's commercial inspection system satisfied the third *Berger* prong. Consequently, we upheld the warrantless search of the trailer at issue in *Vasquez-Castillo*.

The analysis in *Vasquez-Castillo* largely controls the outcome in this case. As we observed there, New Mexico's regulatory scheme clearly contemplates entrance into the trailer to inspect blocking and bracing, and also allows inspection of the contents of the vehicle. *See* N.M. Stat. Ann. §65-5-1(F).[7] While in *Vasquez-Castillo* we held New Mexico's scheme as to the inspection of blocking and bracing satisfied the *Burger* test for warrantless searches, we

---

[6] "Along with numerous other requirements, both federal and New Mexico regulations require proper blocking and bracing." *Vasquez-Castillo*, 258 F.3d at 1211 (citing 49 C.F.R. § 393.104 & N.M. Admin. Code § 18.2.3.13). "Proper blocking and bracing ensures that the cargo is secured so that, when the vehicle decelerates . . ., the cargo is protected against shifting sideways in transit." *Burch,* 153 F.3d at 1142 n.2 (quotation omitted). "'To check blocking and bracing, an officer must inspect the interior of a trailer.'" *Vasquez-Castillo*, 258 F.3d at 1211 (quoting *Burch*, 153 F.3d at 1142 n.2).

[7] "To determine whether the vehicle is safe, those in charge of the port of entry are permitted to 'inspect the vehicle *and its contents* to determine whether all laws and all rules and regulations of the departments of [New Mexico] with respect to public safety, health, welfare and comfort have been fully complied with.'" *Vasquez-Castillo*, 258 F.3d at 1211 (quoting N.M. Stat. Ann. § 65-5-1(F)).

specifically reserved the question of whether the regulatory authorization to inspect the cargo inside the trailer would also have justified entry.  258 F.3d at 1212 n.3.  We see no reason, and Gwathney fails to provide a convincing one, to analyze the entry into the trailer to inspect blocking and bracing differently than the inspection of the cargo when the statutory scheme authorizing both was generally approved of in *Vasquez-Castillo*.  "The *Burger* criteria apply to a regulatory scheme generally, not to the particular search at issue." *United States v. Maldonado*, 356 F.3d 130, 136 (1st Cir. 2004).  "In other words, the *Burger* criteria are applied generally to a statutory scheme, not to a given set of facts arising under that scheme." *Id*.  Thus, Officer Smid was justified in entering the trailer to inspect the cargo pursuant to his regulatory duty to inspect the contents of the trailer.  *See* N.M. Stat. Ann. § 65-5-1(F); *Johnson*, 408 F.3d at 1322 (general state administrative search scheme covering salvage yards satisfied *Burger* and allowed agents to inspect a locked toolbox even though not specifically authorized to do so).  We need not decide if New Mexico's regulatory scheme authorized the actual opening of boxes, because we agree with the district court that on the facts in this record, Officer Smid had probable cause to inspect the non-conforming packages for contraband after permissibly entering the trailer to inspect the cargo, blocking and bracing.

## II. Admission of Evidence

We review the district court's admission of evidence for an abuse of

discretion.  *United States v. Resendiz-Patino*, 420 F.3d 1177, 1181 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1098 (2006); *United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995).  If the trial court erroneously admitted evidence, we need not reverse a conviction if the error was harmless.  *Resendiz-Patino*, 420 F.3d at 1181; FED. R. CRIM. P. 52(a).  To determine whether the erroneous admission of evidence was harmless, we review the record de novo to determine whether the evidence had a "'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such an effect."  *United States v. Wacker*, 72 F.3d 1453, 1473 (10th Cir. 1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum [record]."[8]  "The rationale behind the business

---

[8] Rule 803 provides in relevant part:

The following are not excluded by the hearsay rule . . . :

**(6) Records of Regularly Conducted Activity.** - A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of the

records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records." *Timberlake Const. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 341 (10th Cir. 1995).[9]  To satisfy Rule 803(6), "a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; . . . (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant;" and (4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness. *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1017 (10th Cir. 2004) (quotation omitted).  Of course, the proponent of the document must lay a proper foundation for its admission.  *See United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999).

"Not every item of business correspondence constitutes a business record." *Echo Acceptance Corp. v. Household Retail Svcs., Inc.*, 267 F.3d 1068, 1091 (10th Cir. 2001) (citing *Breeden v. ABF Freight System, Inc.*, 115 F.3d 749, 754

information or the method or circumstances of preparation indicate a lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

[9] *See also United States v. Snyder*, 787 F.2d 1429, 1433-34 (10th Cir. 1986) ("The business records exception is based on a presumption of accuracy, accorded because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the nation's business.").

(10th Cir. 1997)). "It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business." *Timberlake Const. Co.*, 71 F.3d at 342. Moreover, business records are potentially fraught with double hearsay. *See*, *e.g.*, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 729 (10th Cir. 1993). "Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (10th Cir. 1991). Any information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible. *Id*.

In this case, Exhibit 55 contained two documents: a subpoena issued by Special Agent Ivar Hella of the Drug Enforcement Agency, and Western Union's Response to the subpoena. The district court admitted Exhibit 55 during Special Agent Hella's testimony, reasoning:

> as the case agent and the one who conducted the investigation, he can testify as to the contents of the results of his investigation in terms of issuing the subpoena. If there's a foundation laid under 803(6) on these subpoenas that they are treated as business records of the DEA, then I'm going to allow - it's not a business record of Western Union *because he can't lay that foundation*. But the agent can lay a foundation about the way DEA records and keeps its documents, and *since it's a response to a DEA subpoena and part of the investigation, I think it would be a business record of DEA*.

(R. Supp. Vol. II at 339-40 (emphasis added).) Gwathney does not challenge the district court's determination as to the DEA subpoena, but rather argues Exhibit

-12-

55 as a whole was inadmissible on this record because it contained hearsay statements of Western Union. We agree.

Western Union's response to the DEA's subpoena is a separate document from the subpoena itself and constitutes hearsay. *See* FED. R. EVID. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *United States v. Kim*, 595 F.2d 755, 762 (D.C. Cir. 1979) (bank's response to a subpoena was inadmissible hearsay). As such, the response must fall within its own exception to the hearsay rule to be admissible. *See* FED. R. EVID. 802; *Wilson,* 939 F.2d at 271. Contrary to the district court's reasoning, the DEA cannot claim Western Union's response as one of its *own* business records for the simple reason the DEA did not prepare the document. The fact Western Union's response is likely trustworthy given that it was "required to comply with the terms of the subpoena" does not change this basic fact. (Appellee's Br. at 35); *accord United States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993) (holding hearsay imbedded in a business record may be admissible only where information is trustworthy, such as where the preparer of the document checked the accuracy of the information). If the government wanted to pursue such an argument, it could have tried under the residual exception in Rule 807,[10] but it was not raised.

_____

[10] Rule 807 provides in part:

If the Western Union document was to be admitted as a business record under Rule 803(6), it would have to be admitted as a business record of Western Union.[11] As the district court correctly noted, Special Agent Hella could not lay a foundation for the Western Union's response. Absent a proper foundation and applicable hearsay exception, it was error to admit Western Union's response to the DEA subpoena.

The error, however, was harmless. The premise of Gwathney's defense was that he was unaware of the presence of the marijuana in his trailer. Had the jury believed him, he would have been acquitted. The evidence regarding the wire transfer (later determined to be $921) went to at least part of the source of the $14,000 in cash, not its existence. Nor did it directly address Gwathney's knowledge of the drugs contained in his trailer. Assuming the information contained in Western

---

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

*See United States v. Lawrence*, 405 F.3d 888, 902-03 (10th Cir.) (applying Rule 807), *cert. denied*, 126 S.Ct. 4687 (2005).

[11] We note, however, the difficulty of establishing Western Union's response to the subpoena as a business record even if a proper foundation were laid. From all appearances, the document was prepared in advance of litigation and was not regularly produced by Western Union. *See Kim*, 595 F.2d at 761-62 (holding bank record was inadmissible under Rule 803(6) because, *inter alia*, it was generated in response to a government subpoena).

Union's wire transfer receipt would not have been presented to the jury otherwise, the jury could have either believed Gwathney's testimony that Shaw wired him the money for his repairs, or rejected his explanation. Assuming Gwathney received money from Shaw, the owner of the truck, the jury could have inferred the money was unrelated to the criminal activity or that Gwathney and Shaw were working in concert to smuggle drugs. In any event, neither alternative eliminates the possibility that Gwathney knew the drugs were in the back of his truck. *See Resendiz-Patino*, 420 F.3d at 1181-82 (discussing inferences possibly drawn from improperly admitted evidence and holding it harmless where no inference eliminated the possibility of guilt). Error that undermines the defendant's credibility as to a tangential issue is harmless and in this case harmless beyond doubt. Gwathney's credibility may have been eroded by the improper evidence, but barely. The evidence fairly screams of his knowledge of the drugs secreted in his trailer. By comparison, his denials seem bankrupt.

**III. Jury Instructions**

We review a district court's decision to give a particular jury instruction for an abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law. *United States v. Soussi*, 316 F.3d 1095, 1106 (10th Cir. 2002).

The jury instruction at issue, Instruction 13, is a permissive instruction because it tells the jury it may, but is not required to, draw an inference about Gwathney's knowledge of the marijuana stored in his truck based on his operation of the vehicle.

-15-

*See County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 159 (1979); *United States v. Cota-Meza*, 367 F.3d 1218, 1221 (10th Cir.), *cert. denied*, 543 U.S. 876 (2004). A permissive inference instruction does not violate a defendant's Sixth Amendment rights provided there is a rational connection between the facts proved by the prosecution and the ultimate fact presumed, and the inferred fact is more likely than not to flow from the proven facts. *Cota-Meza*, 367 F.3d at 1221-22. We evaluate the likelihood in the context of the specific case in which the instruction was given. *Id*. at 1222.

In this case, Gwathney was the sole operator of the trailer containing the drugs. Although he did not load the trailer, the load was not sealed by the packers, and Gwathney signed the bill of lading. The shoe prints and crushed boxes leading to contraband may have suggested that someone placed the boxes containing 335 pounds of marijuana in the truck after the potato pallets had been loaded and while it was under Gwathney's control. Based on the evidence, that someone might well have been Gwathney, the operator and custodian of the vehicle and the load, or someone acting at his behest or with his knowledge. On the other hand, it is possible, in flight of fancy, to think someone at the loading site, or persons unknown, surreptitiously laced the spuds with marijuana hoping it would somehow find its way to the right destination 2000 miles away without the knowledge or complicity of the driver. But the jury was not required to infer from Gwathney's unique position that he had knowledge of the 335 pounds of marijuana in his trailer. It was simply permitted to

draw the most likely inferences from available evidence. The high value of the marijuana might also, and legitimately, lead a jury to consider it less likely the drugs would be transported without the driver's knowledge. *See Cota-Meza*, 367 F.3d at 1222. Our precedent allows a jury to infer the driver of the vehicle has knowledge of drugs contained within it. *See United States v. Badilla*, 383 F.3d 1137 (10th Cir. 2004), overruled on other grounds by *Badilla v. United States*, 543 U.S. 1098 (2005) (applying *United States v. Booker*, 543 U.S. 220 (2005)), *cert. denied*, 126 S.Ct. 1344 (2005); *Cota-Meza*, 367 F.3d at 1222; *United States v. Levario*, 877 F.2d 1483, 1485-86 (10th Cir. 1989), overruled on other grounds by *Gozlon-Peretz v. United States*, 498 U.S. 395 (1991). On these facts, Gwathney's custody and control of the truck and trailer fully justifies the permissive instruction given by the court. Certainly, the court did not abuse its discretion by giving Jury Instruction 13.

**IV. Motion for a New Trial**

Gwathney filed a motion for a new trial based on his post-trial discovery of a Western Union record showing he had received $921 by wire transfer from Solomon Shaw on May 14, 2004. The district court denied the motion. Gwathney challenges its ruling on appeal.

Rule 33 of the Federal Rules of Criminal Procedure authorizes district courts to grant new trials "if required in the interest of justice." A motion for a new trial based on newly discovered evidence is generally disfavored and "should be granted only with great caution." *United States v. Combs*, 267 F.3d 1167, 1176 (10th Cir. 2001)

(quotation omitted). To procure a new trial based on newly discovered evidence not involving a *Brady* violation,[12] the defendant must show:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997) (quotation omitted). We review the denial of a motion for a new trial under the abuse of discretion standard. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). "A decision is an abuse of discretion only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *Combs*, 267 F.3d at 1176 (quotation omitted).

There is no dispute in this case that the evidence at issue was discovered after trial thus meeting *Sinclair*'s first factor. In our judgment, however, Gwathney failed to meet the second factor. It is likely Gwathney's failure to learn of the existence of a wire transfer receipt from Solomon Shaw was caused by a lack of diligence. Gwathney, as the recipient of the wire transfer, was certainly in the best position to know of the document's existence and to request it prior to trial. He claims he "had no reason to know that discovery of Western Union records of the wire transfer would

---

[12] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The five part test to procure a new trial based on newly discovered evidence is not applicable when a *Brady* violation has occurred. *United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994); *see also United States v. Lopez*, 372 F.3d 1207, 1210 (10th Cir. 2004) (conducting new trial analysis for *Brady* violations).

be required" until the government produced its "surprise" rebuttal testimony. (Appellant's Br. at 24.) Yet Gwathney was aware prior to trial of the irregular $14,000 cash payment. He could have anticipated the source of the cash would be relevant at trial and sought to obtain supporting documents he knew existed. Nor should the introduction of supporting documents in rebuttal have surprised Gwathney. It was Gwathney who offered Shaw as the source of the cash at trial, without any documentation in support of his contention. *See Sinclair*, 109 F.3d at 1531 (holding the defendant could have reasonably anticipated the relevance of certain documents, which remained constant throughout the trial, and sought to obtain them before trial).

The district court also found the new evidence to be of an impeaching nature thus failing *Sinclair*'s third factor. We agree. Impeachment evidence is evidence that undermines the credibility of a witness. Gwathney concedes he presented the new-found Western Union receipt "in the form of impeachment evidence," but argues its effect "was to rehabilitate Defendant's credibility." (Reply Br. at 12.) We are not persuaded by this distinction. Impeachment evidence offered by a defendant will almost always have the effect of rehabilitating his credibility, or at least bolstering his theory of the case.

Even if we were to accept Gwathney's characterization of the evidence, however, we agree with the district court that it was not "material to the *principal* issues involved" in the case. *Sinclair*, 109 F.3d at 1531. At best, the wire receipt may support Gwathney's credibility as to a tangential issue — *i.e.*, the source of some

of the money used for the repairs — but we are hard pressed to see how it effectively does so. He received a $921 wire transfer, but paid $14,000 in cash for the repairs. In any event that evidence is silent as to the principal issue of the case — Gwathney's knowledge of the presence of drugs in his truck. *See United States v. Toro-Pelaez*, 107 F.3d 819 (10th Cir. 1997) ("Although [the wire transfer record] would be relevant to whether a person named Jorge wired [the defendant] funds, it does not speak to the question central to the trial: whether [the defendant] knew that he was transporting 200 kilograms of cocaine."). Abstract bolstering of credibility does not bear directly on the principal issue of the case — knowledge of the drugs. Gwathney's argument that he had no reason to anticipate the necessity of discovering the wire transfer receipt in advance of trial only confirms this conclusion. We therefore cannot say the jury would have reached a different verdict had it heard the new evidence. Consequently, the district court did not err in denying Gwathney's motion for a new trial.

**AFFIRMED**.