FILED
United States Court of Appeals
Tenth Circuit

June 10, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

CARLOS LOPEZ,

     Defendant-Appellant.

No. 09-3148
(D.Ct. No. 2:06-CR-20183-JWL-01)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **O'BRIEN**, **BRORBY**, and **GORSUCH**, Circuit Judges.

_____


After examining the briefs and appellate record, this panel has determined

unanimously to honor the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.


A jury convicted Defendant-Appellant Carlos Lopez of one count of

conspiracy to distribute and possess with intent to distribute methamphetamine, in

_____

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

violation of 21 U.S.C. § 846[1], and one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).[2] Mr. Lopez appeals the district court's denial of his motion for a new trial based on new evidence which he alleges establishes a cooperating witness provided false testimony against him. We exercise our jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Factual Background

The underlying, undisputed facts surrounding Mr. Lopez's conviction are set forth in the district court's memorandum and order denying Mr. Lopez's motion for a new trial and will not be discussed in their entirety here. Instead, for the purpose of this appeal, we summarize only the relevant facts, as follows.

On December 11, 2006, at approximately 9:20 a.m., Dana Suchma, a special agent with the Drug Enforcement Agency (DEA) who was performing drug interdiction surveillance at a hotel in Kansas City, Kansas, ran a check on a red truck parked in the hotel parking lot with its engine running. The occupant was Mr. Lopez, of Pharr, Texas. At that time, Special Agent Suchma requested

---

[1] The related penalty statutes on this count included 21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(A).

[2] The related penalty statutes on this count included 18 U.S.C. § 2 and 21 U.S.C. §§ 812 and 841(b)(1)(A).

assistance, after which DEA Task Force Officers Jim Morgan and Mike Stephens arrived in separate vehicles at the hotel parking lot and also set up surveillance on the red truck. Almost an hour after Special Agent Suchma spotted the red truck with the engine running, the three officers witnessed the same red truck leave the hotel parking lot and enter the parking lot of a Sonic drive-in located next to the hotel. At that time, they also observed a green truck follow the red truck into the Sonic parking lot and pull into the space directly next to the red truck. Based on their various vantage points and radio contact with each other, together they witnessed Mr. Lopez exit the red truck and walk to the front of it while a passenger of the green truck, later identified as Alfonso Urena-Bonilla, exited carrying a white Styrofoam cooler with red handles. Mr. Urena-Bonilla walked to the rear of the two trucks and placed the cooler in the bed of Mr. Lopez's red truck. During this time, another individual, Hugo Nunez-Ayala, exited the green truck, leaned against it on the passenger's side, and seemed to be scanning the area.

Subsequently, Mr. Lopez reentered the red truck and backed out of the stall where Mr. Urena-Bonilla approached Mr. Lopez and engaged in a brief conversation with him through the driver's side window area. Mr. Lopez then exited the parking lot and proceeded south on I-35. Agent Suchma, Officer Stephens, and another DEA Task Force officer, Sara Eberhard, who had arrived at

-3-

the Sonic, followed him and continued surveillance until Kansas Highway Patrol Troopers Charles Lovewell and Tom Catania took over following him and made a traffic stop. Meanwhile, Officer Morgan stayed with the green truck and followed it to its next destination.

After stopping the red truck, Trooper Lovewell questioned Mr. Lopez, who said he was traveling from Miami and Dallas to Kansas City to buy a house and sign the necessary papers in person. Thereafter, Mr. Lopez agreed to let them search his vehicle, where they found the Styrofoam cooler with red handles containing several oranges covering seven bundles of methamphetamine. After receiving advisement of his *Miranda* rights, Mr. Lopez told Trooper Lovewell two guys approached him in the parking lot, put the cooler in the back of his truck, asked him to watch it, and said they would be back in an hour to collect it, but Mr. Lopez forgot to wait and drove off before they came back.

At the time of his arrest, authorities discovered $500 in Mr. Lopez's pocket. After Mr. Lopez was taken into custody, Agent Suchma and Officer Eberhard interviewed him. This time, he explained he came to Kansas to purchase a three-acre lot and meet an individual named Avelino at the Sonic to sign some paperwork. He identified Avelino as the nephew of the man selling the property, but he did not know their full names or telephone numbers and said he

did not have the papers because Avelino took them to be notarized. He also stated that while he was waiting in his vehicle for Avelino to call him, three men approached him and asked him to watch their cooler for them. He said he waited twenty-five minutes after they placed the cooler in his truck before he drove to the Sonic to meet Avelino and his uncle, where he signed the papers. When questioned why anyone would leave a large amount of narcotics worth a great deal of money with a stranger, he explained he thought the three men had become scared by sirens.

Immediately thereafter, a Spanish-speaking DEA Task Force officer, Tim Ditter, joined the other agents in interviewing Mr. Lopez in Spanish, at which time Mr. Lopez recounted the same general story. Mr. Lopez was then informed he had been under surveillance, the cooler was seen placed in his truck at the Sonic rather than the hotel parking lot, and he was seen having a conversation with the person who put it in his truck. In response, Mr. Lopez stated, "if you were watching me, then you know that I never touched the cooler and that my prints are not on it." The interview then terminated.

Meanwhile, Officer Morgan, who continued surveillance of the green truck, followed the truck to an auto shop, watched three individuals, including Mr. Urena-Bonilla, who handled the cooler, exit the truck and enter the parking lot of

the shop to look at vehicles. At that time, Officer Morgan, together with two other DEA Task Force officers, arrested all three individuals. After Mr. Urena-Bonilla received advisement of his *Miranda* rights, he stated he came to Kansas City to buy used cars. When asked about the contents of the Styrofoam cooler, he said it contained oranges; when asked about narcotics, he implicated Mr. Nunez-Ayala, saying he was involved with narcotics and told him to put the cooler in the red truck when they arrived at the Sonic. While Mr. Urena-Bonilla also stated the cooler had been in Mr. Nunez-Ayala's green truck before he arrived from Texas, a search of Mr. Urena-Bonilla's truck revealed a receipt from a gas station in Oklahoma for a Styrofoam cooler exactly like the one removed from the green truck and placed in Mr. Lopez's red truck.

Mr. Urena-Bonilla later agreed to talk to DEA officials on advice of counsel. In an interview in February 2007, Mr. Urena-Bonilla admitted to his, Mr. Nunez-Ayala's, and Mr. Lopez's involvement in trafficking the seven packages of methamphetamine but denied his family's involvement in drug trafficking. However, in a second interview in April 2007, he admitted to his family's involvement.

At trial, Mr. Urena-Bonilla testified he first met Mr. Lopez in May 2006 in Texas by happenstance when Mr. Urena-Bonilla had car trouble; they met again

in October 2006 in Dallas when Mr. Urena-Bonilla was looking for someone to transport methamphetamine for him. Although Mr. Urena-Bonilla had been using family members, including his wife and sister-in-law, to help smuggle drugs, he said he decided to use Mr. Lopez to transport drugs because he did not want to risk using his family any longer. Mr. Urena-Bonilla also testified he delivered five kilograms of cocaine to Mr. Lopez in Pharr, Texas, on December 8, 2006, and then met with him again on December 10, after which they traveled separately to Kansas City. Mr. Urena-Bonilla also stated he drove through Oklahoma and purchased the Styrofoam cooler from a gas station for the purpose of storing the methamphetamine he planned to pick up from Mr. Nunez-Ayala and give to Mr. Lopez to transport. He also said Mr. Nunez-Ayala drove him to another house to pick up the methamphetamine, after which they met Mr. Lopez at the Sonic. He described putting the cooler in Mr. Lopez's truck and then briefly speaking with him through the driver's side window area when Mr. Lopez asked him for $500 for payment toward transporting the methamphetamine.

Not only did the government present the testimony of the law enforcement officers involved in the surveillance, arrests, and interviews, but Special Agent Suchma also testified at trial as to the telephone records recovered concerning the cell phones taken from Mr. Lopez and Mr. Urena-Bonilla at the time of their arrests on December 11, 2006. The pattern of phone calls between them

established that in ten days they talked twenty-two times.[3]  In addition, a forensic chemist with the DEA testified the seven bundles in the cooler tested positive for methamphetamine.

At the trial Mr. Lopez testified in his own defense, stating he first met Mr. Urena-Bonilla on a highway in Texas when Mr. Urena-Bonilla's car broke down and he helped fix it; at that time, they exchanged phone numbers.  Mr. Lopez also testified that after they met, Mr. Urena-Bonilla hired him on one occasion to transport cars and still owed him $500 for that job.  He further explained he left Florida in December 2006, went to Texas to sell a trailer, and then headed to Kansas City, where he planned to look at mobile homes and attend three car auctions.  According to him, he met Avelino at the hotel parking lot and then waited to hear from Mr. Urena-Bonilla.  After he and Mr. Urena-Bonilla talked on the phone, they agreed to meet at the Sonic, where Mr. Lopez got out of his truck and met with Mr. Urena-Bonilla to get his money.  He denied seeing Mr. Urena-Bonilla put the cooler into his truck, that the methamphetamine was his, or that he knew about Mr. Urena-Bonilla's involvement in drug trafficking.  Following the presentation of both parties' evidence at trial, a jury convicted Mr. Lopez on both drug counts.

---

[3]  These phone calls included one call on December 2, 2006; six calls on December 4; three calls on December 7; two calls on December 9; six calls on December 10; and four calls on December 11 – the day of their arrests.

## II. Procedural Background Concerning Motion for New Trial

Prior to sentencing, Mr. Lopez filed a motion for a new trial, claiming new evidence established Mr. Urena-Bonilla provided false testimony against him. The new evidence at issue regarded a written affidavit of a federal prisoner, Geovani San Pedro Lopez. In that affidavit, Mr. San Pedro Lopez claimed he overheard Mr. Urena-Bonilla tell another unidentified inmate he received a lower sentence by giving the "feds" a "scapegoat," who was a "stupid Cuban" to whom he owed $500, and that his lawyers had helped him concoct his story to protect him because he was afraid to identify the actual drug "chauffeur," who belonged to the same Tijuana cartel as he and his brother and knew where their family lived. When Mr. San Pedro Lopez asked Mr. Urena-Bonilla who the "stupid Cuban" was, Mr. Urena-Bonilla allegedly identified him as "Carlos Lopez." In seeking the motion for a new trial, Mr. Lopez's counsel relied on our decision in *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008), in explicitly stating that for a new trial to occur, "the evidence must be of such a nature that it would *probably* produce a different outcome in the case." (Emphasis added.)

The district court held an evidentiary hearing on the motion, where Mr. San Pedro Lopez testified consistent with his sworn affidavit. Mr. Urena-Bonilla also testified, denying he made any such statements and insisting he told the truth at trial when he identified Mr. Lopez as the driver hired to transport the

-9-

methamphetamine. He also testified his attorneys told him the best way to help himself was to cooperate and tell the truth. The government also admitted into evidence the sworn affidavits of Mr. Urena-Bonilla's attorneys, who both denied working with him to concoct a story to reduce his sentence and, instead, stated they instructed him that he would best benefit by telling the truth.

Following the hearing, the district court issued a thorough and well-reasoned thirty-eight-page memorandum and order, exhaustively outlining the evidence offered at trial, discussing the newly discovered evidence regarding Mr. San Pedro Lopez, and applying the five criteria we applied in *United States v. Higgins*, 282 F.3d 1261, 1278 (10th Cir. 2002), in determining whether to grant Mr. Lopez's motion for a new trial based on new evidence. As the district court explained, the criteria applied in *Higgins* required Mr. Lopez to show:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would *probably* produce an acquittal.

*Id.* (emphasis added). The parties agreed this five-part criteria applied, including the fifth criterion that the new evidence must be of such a nature a new trial would probably produce an acquittal.

-10-

In applying these criteria, the district court found Mr. Lopez met at least four of the five criteria because Mr. San Pedro Lopez's affidavit and testimony concerning the conversation he allegedly heard occurred after the trial; Mr. Lopez's failure to learn of this evidence was not caused by his lack of diligence; and the evidence was more than merely impeaching and material to the principal issues involved because if the conversation alleged was true, it not only called into question Mr. Urena-Bonilla's credibility but would support Mr. Lopez's testimony he did not know the cooler contained drugs. However, with respect to the fifth criterion, the district court found that even though Mr. San Pedro Lopez's story did substantiate some of Mr. Lopez's claims at trial, it "would not *probably* produce an acquittal in the face of the other evidence the government presented at trial." (Emphasis added.)

In making this determination, the district court first explained the sworn affidavits of Mr. Urena-Bonilla's attorneys, which were not challenged by Mr. Lopez, contradicted Mr. San Pedro Lopez's claim Mr. Urena-Bonilla said his attorneys helped him concoct a story and, instead, corroborated Mr. Urena-Bonilla's testimony his attorneys told him the best way to help himself was to cooperate with the government and tell the truth. It next pointed out Mr. Urena-Bonilla's testimony at trial about his and his family's involvement in drug trafficking enhanced his credibility, and, while he lied during his first interview

about his family's involvement, he subsequently admitted to his brother's, wife's, and sister-in-law's drug trafficking activities in his second interview and at trial. It also explained Mr. Urena-Bonilla's testimony was consistent with the other evidence admitted at trial, including what transpired at the Sonic and hotel, as corroborated by law enforcement officers, while Mr. Lopez's versions of what transpired were directly contradicted by the same officers who witnessed the events as they transpired at the hotel and Sonic.

Not only were Mr. Lopez's versions of events not corroborated by the evidence presented at trial, but the district court also pointed out the jury had an opportunity to consider the credibility of the witnesses and clearly rejected Mr. Lopez's version of events as inconsistent and incredible. It also pointed out that in order to believe Mr. Lopez and disbelieve Mr. Urena-Bonilla, the jury would have to disbelieve the testimony of the federal agents who saw the drug transaction.[4] Finally, it determined:

> Even if the jury found Mr. San Pedro Lopez's demeanor to be credible and that he had no motive to falsify, the addition of this evidence would not overcome the weight of the other evidence admitted at trial and the stark contrasts between Mr. Lopez's story and the surveillance evidence, and consequently, the fifth *Higgins* factor – whether the new evidence is of such a nature that a new trial would probably produce an acquittal – is not satisfied.

---

[4] This observation by the district court occurred at the hearing for a new trial rather than in its memorandum and order following the hearing.

-12-

Based on this fifth factor, the district court denied Mr. Lopez's motion for a new trial and, thereafter, sentenced him to 360 months imprisonment on each count, to run concurrently.

## III. Discussion

On appeal, Mr. Lopez contends the district court erred in denying his motion for a new trial based on the newly discovered evidence consisting of Mr. San Pedro Lopez's affidavit and testimony showing Mr. Urena-Bonilla perjured himself. Rather than applying the fifth criterion outlined in our *Higgins* decision, he suggests the district court should have applied the Seventh Circuit Court's decision, *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), which he claims requires only that the newly discovered evidence "might have caused the jury to reach a different conclusion." He suggests this "is the better approach because the alternative is to insulate perjury."

In response, the government points out Mr. Lopez agreed during the district court proceedings that the *Higgins* five-part test applied, and only now asserts on appeal that the district court applied the wrong legal standard to his motion for a new trial. It also points out this circuit has repeatedly and consistently applied the five-pronged test applied by the district court, and that the fifth prong, at issue here, requires the district court "to determine whether the newly discovered

-13-

evidence is of such a nature that a new trial would *probably* have produced an acquittal." It contends this circuit has only discussed applying a less stringent standard than the probability standard in instances where the government knowingly, recklessly, or negligently used the perjured testimony. In seeking to apply *Larrison* instead, the government argues, Mr. Lopez is asking us to overrule our own precedent and apply a less stringent standard of "whether the newly discovered evidence 'possibly' or 'might' have caused the jury to acquit" him. Finally, it points out the Seventh Circuit has overruled *Larrison*, holding a probability standard should be applied instead of the less stringent possibility standard.

We begin with the applicable standard of review and legal principles. We review the district court's denial of a motion for a new trial based on newly discovered evidence for an abuse of discretion. *See Redcorn*, 528 F.3d at 744. Denial of a new trial "is an abuse of discretion only if it is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Gwathney*, 465 F.3d 1133, 1144 (10th Cir. 2006) (internal quotation marks and citation omitted). "'A motion for a new trial based on newly discovered evidence is generally disfavored and should be granted only with great caution.'" *Redcorn*, 528 F.3d at 743 (quoting *Gwathney*, 465 F.3d at 1143-44).

A district court is authorized to grant a new trial if the interests of justice require. *See* Fed. R. Crim. P. 33(a). When the motion for a new trial is based on newly discovered evidence, the five-pronged test described in *Higgins* applies. *See* 282 F.3d at 1278. Specifically, the defendant must show:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.* Because only the fifth prong is at issue in this case, we decline to address the others.

With respect to the fifth prong, the government correctly submits this circuit has consistently and repeatedly applied the "probability standard" to motions for a new trial based on newly discovered evidence. *See United States v. Torres,* 569 F.3d 1277, 1280-81 & n.1 (10th Cir. 2009); *Redcorn*, 528 F.3d at 743; *Higgins*, 282 F.3d at 1278; *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972); *Evans v. United States*, 122 F.2d 461, 468-69 (10th Cir. 1941). The government also correctly points out this court has only considered applying a less stringent standard, such as the one in *Larrison*, when "the government has knowingly, recklessly, or negligently offered false testimony." *United States v. LaVallee*, 439 F.3d 670, 701 (10th Cir. 2006); *see also United States v. Sinclair*,

-15-

109 F.3d 1527, 1532 (10th Cir. 1997).  In *Sinclair*, we discussed the less stringent standard applied by the Seventh Circuit's *Larrison* decision but failed to apply it, recognizing instead that we apply the "stricter probability standard" in cases dealing with post-trial discovery of perjury.  *See* 109 F.3d at 1532.

Concerning the evidence presented at trial, we leave credibility determinations to the province of the jury, accepting "at face value the jury's credibility determinations and its balancing of conflicting evidence."  *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010), *cert. denied*, ___ S. Ct. ___, 2010 WL 1529296 (May 17, 2010) (No. 09-10057).  "[W]e will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible – that is, only if the events recounted by the witness were impossible 'under the laws of nature' or the witness 'physically could not have possibly observed' the events at issue."  *Id.* (quoting *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001)).

Applying our standard of review and the applicable principles, we hold the district court did not abuse its discretion in denying Mr. Lopez's motion for a new trial based on newly discovered evidence.  Instead, it is clear from the record the government presented such overwhelming inculpatory evidence at trial against Mr. Lopez that Mr. San Pedro Lopez's testimony would not result in an acquittal

under either the "probability standard" or a lesser standard.

First, in applying this circuit's probability standard, we agree with the district court that Mr. Lopez's different versions of what transpired at the hotel and Sonic parking lots were contradicted, not only by the testimony of Mr. Urena-Bonilla, but by at least three federal agents who witnessed the drug transaction as it unfolded. This includes evidence contradicting Mr. Lopez's incredible initial story total strangers gave him the cooler to hold for them and that after he waited some time for them to return and claim it, he left. Instead, the government's evidence showed Mr. Lopez and Mr. Urena-Bonilla knew each other, communicated on numerous occasions just before the drug transaction occurred, followed each other into the Sonic parking lot, parked beside each other, and talked to each other after Mr. Urena-Bonilla transferred the drugs to Mr. Lopez's vehicle, resulting in Mr. Lopez leaving the parking lot without any further delay. Similarly, Mr. Lopez's contention he only transported trucks once for Mr. Urena-Bonilla, for which he was owed the $500, and had nothing to do with the methamphetamine was contradicted, not only by Mr. Urena-Bonilla's testimony, but by the government agents who saw Mr. Lopez receive the methamphetamine from Mr. Urena-Bonilla, as apparently arranged between them by telephone over the course of several days.

Most important, as the district court indicated, the jury had an opportunity to view the witnesses and assess their credibility, and, in rendering its verdict against Mr. Lopez, it is evident it credited the testimony of the government's witnesses over him, including Mr. Urena-Bonilla's testimony which fully and completely corroborated what the other government witnesses testified they saw. In so doing, the jury balanced any conflicting evidence in favor of the government. Nothing about the government witnesses' testimony was so inherently incredible that we would consider overturning the jury's credibility determinations or its verdict. *See Cardinas Garcia*, 596 F.3d at 794.

Not only did the government offer overwhelming credible evidence incriminating Mr. Lopez, but that same evidence contradicts the newly discovered evidence consisting of Mr. San Pedro Lopez's affidavit and testimony. While Mr. San Pedro Lopez contended Mr. Urena-Bonilla said he used Mr. Lopez merely as a "scapegoat" to get a lower sentence, considerable credible evidence established Mr. Lopez was, in fact, a courier for Mr. Urena-Bonilla and in that capacity was caught in the act of receiving the cooler full of methamphetamine from him. In addition, while Mr. San Pedro Lopez claims Mr. Urena-Bonilla said his attorneys helped him concoct a story to implicate Mr. Lopez, those same attorneys submitted contradictory affidavits, which Mr. Lopez failed to contest with any further evidence. Under these circumstances, Mr. Lopez has not carried his

burden of establishing the fifth criterion, which requires a showing Mr. San Pedro Lopez's testimony would "probably" produce an acquittal. For these reasons, the district court did not abuse its discretion in denying the motion for a new trial. Stated another way, nothing indicates the district court's denial of the instant motion was arbitrary, capricious, whimsical, or manifestly unreasonable. *See Gwathney*, 465 F.3d at 1144.

Turning to Mr. Lopez's assertion we apply a less stringent standard than the "probability of acquittal" standard, he raises the issue for the first time on appeal. "We have repeatedly declined to allow parties to assert for the first time on appeal legal theories not raised before the district court, even when they fall under the same general rubric as an argument presented to the district court." *United States v. A.B.*, 529 F.3d 1275, 1279 n.4 (10th Cir.), *cert. denied*, 129 S. Ct. 440 (2008). Even if we considered the issue, nothing in the record or arguments on appeal indicates the government in this case knowingly, recklessly, or negligently offered false testimony, as discussed in this circuit, for application of a less stringent standard than the probability standard. *See LaVallee*, 439 F.3d at 701; *Sinclair*, 109 F.3d at 1532. As to the *Larrison* decision Mr. Lopez asks us to follow, we are not bound by another circuit's precedent, and, in any event, as the government indicates, the Seventh Circuit has overruled *Larrison* and its application of a less stringent standard, opting instead to apply the same

probability standard we apply. *See United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004) (stating "[t]oday, we overrule *Larrison* and adopt the reasonable probability test"), *vacated on other grounds*, 543 U.S. 1097 (2005).

Finally, even if we applied a less stringent standard and considered whether the newly discovered evidence might "possibly" result in an acquittal, Mr. San Pedro Lopez's testimony would not meet that lesser standard. Instead, as previously noted, his testimony he overheard Mr. Urena-Bonilla say Mr. Lopez was merely a "scapegoat" was overwhelmingly contradicted by evidence at the trial showing Mr. Lopez in fact acted as a courier, receiving the methamphetamine from Mr. Urena-Bonilla for transport. This was established not only by Mr. Urena-Bonilla's testimony, but by no less than three law enforcement officers who witnessed, by sight and radio communication with each other, Mr. Lopez receive the methamphetamine from Mr. Urena-Bonilla. Based on this corroborating evidence, we are not persuaded by Mr. Lopez's contention on appeal that Mr. Urena-Bonilla perjured himself at trial when he said Mr. Lopez was a courier hired to transport methamphetamine. Similarly, as previously discussed, Mr. San Pedro Lopez's statement concerning Mr. Urena-Bonilla's attorneys concocting a story was also contradicted, leaving little probability, or even possibility, the newly discovered evidence would result in an acquittal.

IV.  Conclusion

For these reasons, we **AFFIRM** the district court's denial of Mr. Lopez's motion for a new trial and **AFFIRM** Mr. Lopez's conviction.


**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge